HONORABLE RONALD B. LEIGHTON

1
2
3
4
5
6
7
8           UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
9                  AT TACOMA

10    U.S. BANK NATIONAL ASSOCIATION,

11                  Plaintiff,          Case No. C04-5623  RBL

12        v.

13    EEL RIVER INVESTMENT COMPANY, et   ORDER GRANTING DEFENDANT'S
      al,                                MOTION FOR JUDGMENT AS A
14                                       MATTER OF LAW
                    Defendants.
15

16                          **INTRODUCTION**

17        Following five days of trial to the bench, defendant moved for judgment as a matter of law.  The

18   Court, as the trier of fact, having considered the evidence presented in plaintiff's case in chief, determined

19   as the trier of fact that plaintiff failed to establish essential elements of its claim.  The case was dismissed

20   with prejudice.  This Order memorializes the Court's reasoning in granting defendant's motion at the end

21   of plaintiff's case.

22                             **FACTS**

23        In early 2002, Veril Olsen was seeking financing for one of his companies.  He was introduced to

24   Sterne Agee & Leach, Inc., an investment brokerage company ("SAL").  Olsen wanted SAL to assist in a

25   $15 million financing deal.  Dep. of Sullivan, 15:1-17:5.  At the time, a draft private placement

26   memorandum (prepared by defendant Ross) already existed for a proposed $15 million securities offering

27   in the form of a fixed rate trust preferred stock, for which Firstar Bank (later merged with U.S. Bank

28

ORDER
Page - 1

("USB")) was to serve as the custodial agent or trustee.  SAL was only willing to work on the offering if it were a variable rate offering with a high Moody's rating.

SAL agreed to be the Placement Agent for what became the Eel River Investment Company ("ERIC") Trust Preferred Redeemable Stock Series 2002A ("Shares"), responsible for placing the Shares with an accredited investor once their structure was finalized.  A structural requirement was that $15 million appear as equity to Thira Capital, who Olsen expected to provide additional funding in order for ERIC's parent company, Eel River Acquisition Company ("ERAC"), to purchase the assets of a sawmill in Fortuna, California.  Dep. of Sullivan, 18:6-24.  SAL undertook to determine if it could place a stock that actually traded like debt and had the following debt features: the ability to be collateralized; a stated maturity date; regular interest payments; a call feature that allowed the issuer to redeem the security before maturity; a demand feature allowing the investor before maturity to return the security and receive the full amount paid for it; and at least an "AA" Moody's rating.  SAL discussed such a security with John Goetz who possessed extensive institutional investment experience and worked for the Fort Washington Advisors "(FWA"), serving as an agent of the investors in Touchstone Investment Trust Money Market Fund ("Touchstone") and Western-Southern Life Assurance Company ("W-S") (collectively the "Holders") who eventually purchased the Shares.  Dep. of Goetz, 11:13-12:16.

It was decided that the security for repurchase of the Shares would consist of an irrevocable letter of credit from Humboldt Bank with an irrevocable standby letter of credit from the Federal Home Loan Bank of San Francisco ("FHLB") (collectively the "Credit Facility").  Dep. of Goetz, 18:5-8.  This feature gave the Shares a high quality Aaa/P-1 Moody's rating.  Dep. of Goetz, 18:5-13.  SAL and Goetz discussed changes in the structure of the deal that the Holders wanted and SAL relayed these suggestions to ERIC.  Whatever Goetz and ERIC agreed upon became part of the final structure.

The Holders, ERIC, SAL, Michael Ross, and USB were all involved in the formulation of the final structure of the Shares, following extensive negotiation.  Ross, who was ERIC's counsel, drafted the Trust Deposit Agreement with Indenture Provisions ("TDA") and the Confidential Private Offering Memorandum ("CPOM").  (Tr. Exhs. 528 and 512)  USB, which was to serve as Trustee, received drafts of the TDA and the CPOM, which Brian George and his supervisor reviewed.  Dep. of George, 10:11-12; 97:3-100:22.

The final structure of the Shares purported to provide the Holders with a very secure, highly-rated investment with an acceptable return. They would receive variable-rate quarterly interest payments, the amount of which would be calculated each quarter, and they had the ability to require the repurchase of their investment for the full purchase price plus accrued interest for any reason, at any given quarter. See CPOM, 6:8-10; TDA § 2.4; First Amendment to TDA § 2.4(f). (Tr. Exh. 542) Under the structure, the funds to repurchase the Holders' shares would come from the Credit Facility and not ERIC in the event the shares were tendered. See CPOM, pp. 1, 5 and 11. The investment was designed and structured to be as secure as the Credit Facility.

ERIC was a start-up entity with no operating history. See CPOM, p. 13. For that reason, prospective investors were explicitly told not to look to ERIC but, rather, to look only to the Credit Facility and to the strong financial position of the credit issuers (Humboldt and FHLB) as the repayment source of the purchase price on the Shares. CPOM, pp. 11 and 13. As part of the structure, ERIC was to (and did) supply an opinion of counsel that the payment of the purchase price and interest pursuant to the Credit Facility upon tender or redemption of the shares would not constitute a voidable preferential payment for bankruptcy purposes, or a post-petition transfer that would be recoverable from the Holders by a creditor of ERIC. See CPOM, p. 6.

According to John Goetz, the Holders decided to invest in the Shares based solely on the credit support - Credit Facility - and would not have bought the Shares but for such credit support. Dep. of Goetz, 6:6-25; 34:8-13; 37:1-13; 107:23-108; 110:21-11:12. Based on the Credit Facility, the Holders determined that the Shares posed a minimal credit risk. Dep. of Goetz, p. 107:23-108:16; 111:13-22, Tr. Exh. 529.

The Holders purchased their Shares on May 21, 2002. Touchstone purchased $2 million and W-S purchased $13 million. Dep. of Goetz, at p. 106:9-16; 106:22-107:17.[1] At this date, USB held an Irrevocable Direct-Pay Letter of Credit from Humboldt and an Irrevocable Standy Letter of Credit from FHLB, each in the amount of $15,135,000, constituting the security for the Shares, to be drawn upon to

---

[1]On May 23, 2002, in an internal transaction, W-S sold $2 million of its Shares to Touchstone for $2 million in cash. In November 2002, W-S decided to sell another $2 million of its Shares to Touchstone and SAL provided the logistical support needed to affect the actual transfer and sale. On February 4, 2003, W-S sold another $4 million of its Shares to Touchstone for $4 million in cash, with SAL providing the logistical support. Dep. of Goetz, 115:1-7; 185:6-188:24.

pay the Holders the full purchase price they paid for the Shares plus accrued interest in the event the Holders tendered the Shares or in the event that ERIC repurchased them.  The original Letters of Credit were to be held by USB in a secure vault.  Dep. of George, 69:11-71:12.  Therefore, as of such sale date, the representations of the CPOM and TDA material to the Holders' investment decisions, were entirely true.

In June 2002, George and his supervisor left USB.  Dep. of George, 10:11-21; 19:11-22.  Around the time George left, USB assigned the ERIC trust account to Frank Leslie.  Dep. of Leslie (Vol 1 4/14/05), 35:7-18; 38:6-25.

SAL was asked in the Fall of 2002 to determine if there was a way to reduce the Letter of Credit fees ERIC was paying, which culminated in the First Amendment to the TDA, the terms of which were negotiated and agreed to by all the parties including the Holders.  Dep. of Goetz, 50:20-51:4; Dep. of Leslie, 76:21-77, 25.  One of the key changes was the narrowing of the definition of Permitted Investments because the collateral to secure the Holders' investment would no longer be in the form of irrevocable letters of credit, but instead would be in the form of deposits of the $15 million or the investment of those funds in certain limited investments that would still allow the structure to obtain an AA rating from Moody's.  Another important TDA change was the modification of § 3.7 concerning the Withdrawal Credit Facility, which would secure the funds to repurchase the Shares and which was required to be put in place before ERIC could withdraw any of the $15 million.  *See* First Amendment to TDA, § 3.7.

Pursuant to the First Amendment to the TDA, the letters of credit from Humboldt Bank and FHLB were cancelled and the $15 million of proceeds from the initial sale of the Shares was transferred to USB and placed in the Initial Deposit Account (a part of the Share Purchase Account), which funds USB then held in trust for the Holders to repay the purchase price of the Shares when the Holders tendered them.  *See* TDA, §§ 2.4, 4.3(a), 4.3(c).

The deposit of the proceeds with USB in the Initial Deposit Account was designated a "Permitted Investment."  ERIC could appoint an Account Manager ("AM") who had two limited duties, one of which was to "designate the Permitted Investment in accordance with § 4.6 of the TDA."  TDA, § 4.7.  Pursuant to § 4.6, monies in the Share Purchase Account (which includes the Initial Deposit Account) were to be invested or reinvested in Permitted Investments as instructed by ERIC's AM (Veril Olsen was ERIC's

AM).  Leslie was aware that the funds could be invested <u>only</u> in Permitted Investments.  Dep. of Leslie (Vol. I, 4/14/05), 95:23-25.  Section 4.6 explicitly required that "[a]ll Permitted Investments shall be held by or under the control of the Trustee and shall be deemed at all times to be part of the fund and account which was used to purchase the same."[2]  ERIC could not withdraw funds from the Initial Deposit Account unless and until a Withdrawal Credit Facility was provided.  Amended TDA § 3.7.  The Holders were relying on USB as Trustee "to maintain the [$15,000,000] principal on deposit in an investment account pledged solely for the payment of principal on [the Shares]" and were not relying on ERIC to make the requirement payments under the TDA.  Dep. of Goetz at 96:12-22, 119:3-120:18.  After the Amendment, the Holders still found the Shares to be a good investment.  In a memo commenting on the change in the credit facility, Goetz recommended that the Holders keep the Shares because they had "a very attractive yield for such a high quality issue."  Dep. of Goetz, 113:12-24, Tr. Exh. 546.

Approximately one month later, on December 24, 2002, ERIC authorized and directed U.S. Bank to transfer the $15,000,000 in Share proceeds at U.S. Bank to a Swiss bank, Banque de Patrimoines Prives Geneve ("BPP"), for the purpose of investing the same in a Societe Generale Bond fund (hereinafter, "SG Securities"), with the asset to be held ultimately in an ERIC account at BPP.  ERIC assured U.S. Bank that the transfer and purchase of SG Securities was a Permitted Investment under the Indenture.  In the same letter, ERIC stated that U.S. Bank would have the right to immediately liquidate the purported SG Securities and have a first priority to draw upon the proceeds to pay the purchase price of the tendered Shares.  U.S. Bank complied with ERIC's directions and transferred the money to BPP.  ERIC even provided U.S. Bank with confirmation suggesting $15,000,000 had been placed in ERIC's account at BPP on February 17, 2003.  (F. Leslie Dep., Vol. 2) at 82:2-17; 117:16-118:17; (F. Leslie Dep., Exhs. 60, 55 and 24).[3]

What ERIC failed to inform U.S. Bank was that upon receiving the money into its account at BPP, ERIC immediately began to dispose of the funds for improper purposes.  For example, after receiving the SG Securities, ERIC immediately began to liquidate portions of the SG Securities and transfer those funds

---

[2]USB agrees that the duty to hold or control all Permitted Investments under the terms of the TDA as amended was its explicit duty as Trustee.  Dep. of Egan (Vol. I), 102:17 - 103:12.

[3]ERIC's confirmation was itself misleading because it reflected $15,000,000 in SG Securities.  However, the actual cost of the $15,000,000 "face value" investment was only approximately $12,445,500.  Exh. M (V. Olsen Dep., Exh. 101).

to its accounts at Humboldt Bank in California and Key Bank in Washington.  Thereafter, ERIC transferred the funds to defendants Eel River Acquisition Corporation and Eel River Lumber Products, LLC, to purchase sawmills, and to defendant Olsen.  Olsen spent the money for his own personal use and benefit.

In 2004, following notification of a lawsuit against Veril Olsen and Eel River Investment Corp., the Holders, for the first time, doubted the low risk nature of their investment.  The Holders tendered their shares for payment on September 1, 2004.  Holders of $110,000,000 of shares from a similar 2003 offering on behalf of ERIC also tendered their stock for redemption at the same time.  U.S. Bank, as trustee, was able to redeem the $110,000,000 in shares but because it had relinquished control of the $15 million investment it could not pay the principal and interest owed to the 2002 investors.  Promptly, John Goetz, acting on behalf of his institutional investors, demanded payment from U.S. Bank, as trustee.[4]     Within three weeks time, U.S. Bank paid the Holders all that they were owed, acquired the shares and took an assignment for all claims the original Holders might have against those associated with the original stock offering.  U.S. Bank, standing in the shoes of the original investors, then commenced this suit seeking rescission or damages from Eel River and Veril Olsen as Issuer, Michael Ross as counsel for Eel River, and Sterne, Agee & Leach as placement agent or underwriter.

Following a number of settlements, the case proceeded against Sterne, Agee & Leach (SAL) for violation of the Washington State Securities Act (WSSA).  Specifically, U.S. Bank alleged that SAL was a seller or an aider and abettor who sold securities using material misrepresentations or omissions to entice the unwitting investor.  At the end of the day it sought rescission, return of the $15,000,000 purchase price of the stock and interest at the statutory rate of 8% (a much higher rate than the investment contemplated).

The misrepresentations or omissions that U.S. Bank asserted against SAL are as follows:

---

[4]In notes prepared by Goetz (Tr. Exh. 574), the investment advisor noted that a U.S. Bank representative admitted to him that the BPP investment was not a permitted investment under the Amended TDA.  Goetz also noted that U.S. Bank violated §§ 3.7 and 4.6 of the Amended TDA by losing control of the investment (§ 4.6) and by not requiring a withdrawal credit facility (§ 3.7) before relinquishing funds to ERIC.

1.     That the original Articles of Incorporation prepared by ERIC's Attorney Ross did not describe essential terms, rights and obligations of the shares in violation of the Washington Business Corporations Act;

2.     The offering documents prepared by Ross did not disclose the hybrid nature of the stock with essentially debt features;

3.     SAL failed to inform Goetz of Veril Olsen's litigation history,[5] and

4.     Ross failed to disclose that he did not qualify as an "independent director" of ERIC by virtue of the amount his firm was paid by ERIC in 2002.

## DECISION

At the conclusion of plaintiff's case[6], the Court dismissed the claims against SAL for failure to establish essential elements of the claim. Specifically, the Court, as the trier of fact, determined that any misrepresentation or omission in connection with the original offering was not material to the investors (Goetz) and not relied upon by the investors.

The Washington State Securities Act (WSSA) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

1.     To employ any device, scheme, or artifice to defraud;

2.     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; and

3.     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

RCW 21.20.010.

---

[5]SAL denies that the litigation index for Veril Olsen was provided to it by Attorney Ross, and Ross, at trial, cast doubt on his deposition testimony that he provided the information to SAL.

[6]The plaintiff informed the Court that its last witness in its case in chief would be Scott Strodthoff, a U.S. Bank employee. At the conclusion of the direct examination of Mr. Strodthoff, the Court announced its intention to dismiss the plaintiff's case. A recess was taken and plaintiff's counsel informed the Court, for the first time, that it intended to call Veril Olsen in its case in chief but that he would not be to Court until the following day. After lengthy argument, the Court indicated that Veril Olsen's testimony would not inform the Court regarding the elements of materiality or reliance and the Court dismissed the case.

Because the primary purpose of the WSSA is to protect investors, it is construed liberally. *Guarino v. Interactive Objects, Inc.,* 122 Wn. App. 95 (2004). In order to recover damages in an action under WSSA, an aggrieved party generally must show a right to rely on the representation as made. Where an omission forms the basis for the claim, however, "positive proof of reliance is not a prerequisite to recovery. Rather, a rebuttable presumption of reliance is created; which defendant can rebut by showing that the plaintiff's decision would have been unaffected even if the omitted fact has been disclosed." *Id.* at 119.

An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to invest. *TCS, Inc. v. Northway*, 426 U.S. 438 (1976). What the standard contemplates is a showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. *Id.* The issue of materiality may be characterized as a mixed question of law and fact. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him. For purposes of analysis, the "reasonable shareholder" or "reasonable investor" in this case is an institution that is an "accredited investor" as defined in Rule 501 under the Securities Act of 1933.

In the case at bar, institutional investors made their investment only after their representative participated in extensive negotiations to shape the structure of the deal. After those negotiations, a Confidential Private Offering Memorandum (Tr. Exh. 512) was drafted. That Memorandum described what was material to the investors and what obligations were assumed by Sterne, Agee & Leach in connection with their undertaking as placement agent. Specifically, the following disclosures were contained in the CPOM:

> "No financial or operating information with respect to the issuer is included herein. Purchasers of the shares should make their decision to invest in the shares solely upon their assessment of the creditworthiness of the primary credit issuer and the confirming credit issuer. No attempt is made in this Offering Memorandum to describe the issuer in a manner that would enable purchasers of the shares to assess the creditworthiness of the issuer. Accordingly, in deciding whether to purchase the shares, potential investors should not rely on the ability of the issuer to make the required payments under the indenture."

. . .

**"Sterne, Agee & Leach, Inc. has not made any investigation with respect to such information, and no representation or warranty is made by Sterne, Agee & Leach, Inc., as to the accuracy or completeness of such information."**

. . .

"PROSPECTIVE PURCHASERS OF THE SHARES SHOULD LOOK ONLY TO THE CREDIT FACILITY AND NOT THE CREDIT OF THE ISSUER AS A SOURCE OF PAYMENT OF THE PRINCIPAL OF, INTEREST ON AND PURCHASE PRICE OF THE SHARES."

. . .

"IN MAKING AN INVESTMENT DECISION INVESTORS SHOULD CAREFULLY REVIEW THE RISK FACTORS CONTAINED IN THE SECTION ENTITLED "RISK FACTORS" HEREIN."

Under Risk Factors the CPOM states the following:

"The issuer was incorporated in March 2002. Accordingly, it has no operating history upon which you can evaluate its prospects. You must consider its business in light of the risks and certainties and problems frequently encountered by companies with limited operating histories."

Elsewhere in the CPOM, the issuer was described as follows:

"The issuer was formed by Veril Olsen in March 2002 as a subsidiary of ERAC. While it is the intention of the issuer that ERAC will show the value of its holdings in the issuer as an asset of ERAC, neither ERAC nor any creditor of the issues or of ERAC, including without limitation, any lender of ERAC, will have any recourse to the proceeds so held in trust."

In the face of these disclaimers, the investors considered, and then rejected, the idea of conducting their own "due diligence" on the issuer prior to making their investment. (Tr. Exh. 509)

The credit review summary prepared on May 21, 2002 (the date of closing) for the investors set forth what it considered to be material in connection with the purchase of the investment:

"The bonds were purchased solely on the basis of the irrevocable direct pay credit facility issued by Federal Home Loan Bank which guarantees the payment of principal, and interest up to 45 days at a maximum 7.3% annual rate"

. . .

"Rating Rational: Based on the irrevocable direct pay credit facility provided by Federal Home Loan Bank, Fort Washington has assigned an FW1 rating to these bonds. This holding represents minimum credit risk to Touchstone Funds." (Trial Exh. 529)

Finally, the investor required that the investment be rated by Moody's Rating Service before it would approve an investment in ERAC.  On May 21, 2002, Moody's issued its rating at Aaa/P-1 and stated the rational for the rating:

> "The rating is based upon the credit quality of the confirming Letter of Credit provided by the Federal Home Loan Bank of San Francisco and will be changed whenever the Bank's rating changes."

(Trial Exh. 536).

After the structure was modified in September 2002, Moody's re-rated the investment to Aa2/P-1 (a lower rating) to reflect the total reliance on U.S. Bank as Trustee for security and safety of the investment.  (Tr. Exh. 545).

Given the unique facts of this case, it is the inescapable conclusion of this Court that John Goetz and his clients received exactly what they bargained for in their investment.  They knowingly accepted the minimal risk that banks issuing letters of credit would default on the obligations they assumed at the May issuance date.  While Humboldt Bank and Federal Home Loan Bank accepted the risk of performance by the issuer, Goetz and his clients looked only to the Letters of Credit.  Following his negotiations to modify the structure in September 2002, Goetz placed his total reliance on U.S. Bank's ability to maintain control of the investment so that any quarterly tender by the Holders would result in return of principal plus accrued interest.  When he first learned that his reliance on U.S. Bank was perhaps misplaced, Goetz made immediate tender.  Goetz was not disappointed.  Although U.S. Bank had lost control of the investment through its own inattention, as a highly rated financial institution, U.S. Bank stepped up and made the investors whole.

Under the circumstances, it appears conclusively to this Court that Goetz placed his sole reliance on the creditworthiness of those banks issuing letters of credit or, later acting as Trustee to preserve the financial structure of the deal.  Information unrelated to those institutions or to the structure of their obligations to the investors was, in the end, immaterial to Goetz and his decision-making.  U.S. Bank does not advance its effort to obtain indemnification by standing in his shoes.

1    For these reasons, and further discussed at length at oral argument, SAL's Motion to Dismiss is

2  **GRANTED** and U.S. Bank's claims against it under the WSSA are **DISMISSED WITH PREJUDICE**.

3    DATED this 24th day of May, 2006.

4

5

6    _____

7    RONALD B. LEIGHTON
     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 11