UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

U.S. BANK NATIONAL ASSOCIATION,

                      Plaintiff,

      v.

EEL RIVER INVESTMENT COMPANY, et al.,

                  Defendants.

NO. 04-5623 RBL

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>INTRODUCTION</u>

     Although the technical terms used in connection with the underlying transaction combined with the post-execution modifications and maneuvers by the parties make this case seem at first blush to be quite complex, upon closer inspection the transaction as envisioned by the investors is quite simple and the just resolution of this dispute is readily apparent.

     1.     The structure of the deal defined the deal for the parties and determined what was, and what was not, material to the parties.

          a.   The letters of credit (LOC) from Humboldt Bank and from the Federal Home Loan Bank of San Francisco provided the low risk assurance that the investors could receive an above-market return for so long as the issuer could replenish

the fund from which the Humboldt Bank paid the quarterly interest to the investors.

b. Per the deal, as soon as the issuer failed to replenish the fund, a default occurred and the principal (still in the possession of Humboldt Bank) plus accrued interest (whether or not the issuer supplied all the funds to Humboldt Bank) was returned to the investors and the investment ended.

c. So far as the investors were concerned, this investment involved a debt instrument – nothing more or less. They loaned money that was to be "parked" with a reputable bank which promised to deliver above-market interest payments for so-long as a special purpose fund (an interest payment account) was replenished. One additional quarter's worth of interest was guaranteed in the LOC.

d. This was a very predictable, extremely safe investment for so long as it lasted. The only facts of interest to the reasonable investor were those facts relevant to the security of their principle and the payment of a good return. They sought no information and received no information that would allow them to predict how long the issuer might be able to sustain the investment. As investors in a secure debt instrument, their lack of concern for the long-term future of the payment stream was reasonable.

2. The deal was modified through negotiations involving the direct participation of the investors, through their retained representatives. The modified deal changed the risk in the deal only slightly. The modified deal required U.S. Bank, as trustee, to maintain control over the investment so that it could be readily returned at the request of the investors for any reason or no

reason at all.  Although ERIC/Buck Olsen was allowed to direct investment of the funds within a defined range of investments; the basic deal still contained the twin features of a) protection of principal (through direct control of the investment by U.S. Bank and quick return of principal on demand) and b) above-market return guaranteed to one month beyond the time the interest fund was not replenished by ERIC.  Under the circumstances, reasonable investors did not look to facts or circumstances beyond the ability to protect principal and secure above-average rate of return for so long as the issuers' fortunes permitted the investment to continue.

3.      At all times relevant to this dispute, the operative agreements between the parties were fully enforceable.  When U.S. Bank, through its own negligence, relinquished control of the investment, and later when the investors tendered the shares for repayment, U.S. Bank had no valid defenses to the claims of the investors for payment of their principal and accrued interest consistent with the original intent of the parties.  U.S. Bank paid, from its own funds, the face amount of the shares.

      a.   There were no "valid business reasons" that would justify U.S. Bank paying $15 million to the investors absent the legal obligation to do so.

4.      The so-called "Rupp maneuver" was a sham transaction implemented for the sole purpose of cutting off the rights of SAL to redeem the shares in the event the Court ordered rescission as originally requested by U.S. Bank in this lawsuit.  It was part of an overall plan by U.S. Bank to seek indemnification for its own tortious conduct, which is in violation of public policy.

5.      By finding in favor of the defendant, the Court promotes the rule of law by giving effect to the clear intentions of the parties to the underlying contract and by refusing to reward the maneuvers of U.S. Bank to escape the consequences of its own negligence.  The investors, in

Order - 3

whose shoes USB stands, received all that they bargained for and expected to receive when they purchased the subject securities..

Following trial on the merits, the Court enters the following Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

**A.    The Parties to the Lawsuit**

1.    Plaintiff U.S. Bank is a national banking association with its principal place of business in Minneapolis, Minnesota.

2.    Defendant Sterne, Agee & Leach, Inc. ("SAL") was at all times relevant hereto an Alabama corporation.

3.    Defendant Eel River Investment Company ("ERIC") was at all relevant times hereto a Washington limited liability company with its principal place of business in Washington.

4.    Defendant Eel River Acquisition Company ("ERAC") has been during the period relevant hereto a Nevada corporation with its principal place of business in Washington.  ERAC is the sole shareholder of ERIC.

5.    Defendant Veril "Buck" Olsen has been during the period relevant hereto the president and CEO of ERIC, and the sole owner and CEO of ERAC.  At all relevant times, Olsen controlled all of the activities of ERIC and ERAC.

6.    Defendant Michael Ross was, during the period relevant hereto, legal counsel to ERIC, ERAC and Olsen, personally, and was designated as an "independent director" of ERIC.

7.    U.S. Bank settled with defendants ERIC, ERAC, Olsen and Ross, along with several other defendants, prior to trial in May 2006.  Only SAL remained as a defendant for trial.

**B.    Overview of Transactions**

8.    In early 2002, ERIC and Olsen approached SAL through Michael Sullivan, a

broker employed by SAL.  Olsen informed SAL that ERIC needed to raise money so that it would appear to the outside world that ERIC had equity.  The alleged purpose in creating the appearance of equity in ERIC was to assist ERIC and ERAC to attract investors to invest in a sawmill that ERAC would own and operate.

9.     SAL, through Andrew Whitehead (SAL's senior investment banker), at first declined.  SAL told Olsen and Ross that it could assist with a variable rate demand note.  SAL thereafter devised an investment structure to accomplish ERIC's purposes and created the Variable Rate Demand Notes at issue here.

10.     In early 2002, ERIC issued $15,000,000 in Trust Preferred Redeemable Stock, Series 2002A ("Shares"), pursuant to a Confidential Private Offering Memorandum ("CPOM") and other "Initial Offering Documents" discussed below.

### *The Original Investors*

11.     Two investors purchased the Shares in May 2002:  Western & Southern Life Assurance Company ("W&S") and Touchstone Money Market Fund ("Touchstone") (collectively, "Investors").

12.     At all relevant times, John Goetz was the Vice President and Senior Portfolio Manager for Fort Washington Investment Advisors, the investment advisor to the Investors.

13.     As part of his duties, Goetz managed investment portfolios for the Investors.  The Investors ultimately decided to purchase $15,000,000 of the Shares.

### *The Initial Offering*

14.     The Initial Offering Documents included, among other documents:

      a.   CPOM;

      b.   Trust and Deposit Agreement with Indenture Provisions, dated May 21, 2002 ("TDA");

      c.   Legal Opinion of Issuer's Counsel, authored by Ross ("Legal Opinion");

      d.   The Opinion of Special Bankruptcy Counsel, authored by Stoel Rives LLP

("Bankruptcy Opinion");

    e.   Moody's Investors Service Rating Letter;

    f.   Humboldt Bank Direct Pay Letter of Credit Agreement ("Humboldt Agreement"), this primary LOC was backed by a Confirming Letter of Credit issued by the Federal Home Loan Bank of San Francisco;

    g.   Placement Agreement, by which SAL served as placement agent for the Initial Offering; and

    h.   Remarketing Agreement, by which SAL served as the remarketing agent under the Initial Offering and the Amendment.

15.     U.S. Bank served in the role of indenture trustee under the TDA.

16.     The Initial Offering closed on May 21, 2002.

17.     SAL earned commissions of approximately $225,000 from the Initial Offering.

***The Amendment***

18.     Effective September 18, 2002, the Initial Offering was amended.  The Amendment Documents included:

    a.   First Amendment to Trust and Deposit Agreement with Indenture Provisions ("Amended TDA");

    b.   Notice of Consent and Waiver of Tender ("Waiver");

    c.   Humboldt Bank Direct Pay Letter of Credit Agreement (Interest Only) ("Amended Humboldt Agreement");

    d.   Moody's Rating Confirmation Letter; and

    e.   Opinion of Special Bankruptcy Counsel ("Shulkin Opinion).

19.     The Investors each signed a Notice of Consent and Waiver of Tender on September 18, 2002, thereby permitting the Amendment.

20.     U.S. Bank served as the indenture trustee under the Amendment beginning September, 2002, and took receipt of the proceeds of the Shares.

### *The $110 Million Offering*

21.     In April 2003, ERIC issued $110,000,000 in Trust Preferred Redeemable Stock, Series 2003A, pursuant to, *inter alia*, a Confidential Private Offering Memorandum, dated April 28, 2003.  (The transaction relating to the issuance of the shares is referred hereafter as the "$110 Million Offering.")  The terms of the $110 Million Offering were essentially the same as the terms found in the Amendment discussed further below.

### C.     ERIC's Corporate Existence

22.     After meeting with SAL, Olsen had Ross incorporate both ERIC and ERAC in March 2002.  On March 29, 2002, ERIC filed its Articles of Incorporation with the Washington Secretary of State's office.

23.     ERIC was incorporated as a single purpose entity.  ERIC's single purpose was to issue the Shares and create a trust account to hold the proceeds of the Shares.  According to the Articles of Incorporation, ERIC was not permitted to conduct any business apart from issuing the Shares and carrying out its duties or activities as permitted by the TDA.  ERIC was not permitted to have any material assets or to incur debt.

24.     ERIC's Articles of Incorporation created two classes of shares:  the common stock and the Trust Preferred Redeemable Stock ("the Shares").  ERAC held all of the common stock of ERIC.  Olsen owned all of the shares of ERAC.  Olsen served as the President and CEO of both ERIC and ERAC.

### *Mechanics of Interest Payments Under TDA*

25.     ERIC maintained an "Interest Payment Account" with the Trustee, which was to be used to hold the interest payments due each month that were drawn against the Primary LOC.  The Trustee withdrew the necessary funds from the Interest Payment Account to pay the monthly interest to the Investors.

26.     Two business days prior to the Interest Payment Date, the Paying Agent (U.S. Bank) presented a demand for the interest payment amount against the Primary LOC.  The next

day (one business day before Interest Payment Date) Humboldt would then deposit into the Interest Payment Account the amount of interest demanded by the Paying Agent.

27.     If Humboldt refused or failed to timely honor the interest payment demanded by the Paying Agent, the Paying Agent presented a demand for the interest payment against the Confirming LOC.  FHLB, as the Confirming Credit Facility, would then be required to deposit into the Interest Payment Account the amount of interest demanded by the Paying Agent.  (ERIC was obligated to pay whatever FHLB charges were incurred in having to provide a draw on the Confirming LOC.)

### *Mechanics of Interest Payments Under Direct Pay LOC Agreement*

28.     As set forth above, the Direct Pay Letter of Credit Agreement (*i.e.,* the Humboldt Agreement) required Humboldt to pay the interest when demanded, but it could refuse to honor future demands for interest payments if ERIC failed to have sufficient funds available each month to cover the interest payment or to reimburse Humboldt for paying the interest payment, which would then lead to an Event of Default under the TDA and bring the investment to a prompt halt.

29.     The Humboldt Agreement required ERIC to maintain three "Collateral Accounts" with Humboldt in order to secure the draws made upon the Primary LOC:

    a.  Time Certificate of Deposit account held the $15,000,000 in principal from the sale of the Shares.  The funds held in the Time Certificate of Deposit earned interest at the "90-Day Advance Rate established from time to time by the Federal Home Loan Bank of San Francisco."  ERIC had "view-only" access to the Time Certificate of Deposit account.

      b.   <u>Interest Account</u> held the $135,000 "Interest Reserve" and such other funds on a month-to-month basis that were equal to the amount the Trustee was to draw on the Primary LOC each month for payment of interest to the Investors. The funds held in the Interest Account earned interest at Humboldt's "standard interest rates for similar deposits" held at Humboldt. ERIC had "view-only" access to the Interest Account.

      c.   <u>Operating Account</u> held ERIC funds that ERIC could use for general operating purposes.

30.     The interest generated by the $15,000,000 held in the Time Certificate of Deposit and the $135,000 "Interest Reserve" held in the Interest Account were held in the Interest Account for the purpose of paying the monthly interest on the Shares.

31.     It was contemplated and understood that, prior to the initial sale of the Shares and throughout their existence, the amount of interest to be generated by the $15,135,000 held in the Collateral Accounts would be less each month than the amount of interest payments due to the Investors each month. ERIC was required under the Humboldt Agreement to make up that shortfall every month.

32.     The Humboldt Agreement required ERIC to maintain sufficient funds in the Operating Account each month to permit Humboldt to effectuate an automatic transfer of funds into the Interest Account in an amount equal to the Humboldt payment to the Trustee per the Paying Agent's demand. The transfer was to be made "immediately" after Humboldt's transfer of interest payments to the Trustee.

33.     In the event that ERIC did not have enough funds in the Operating Account for the required transfer into the Interest Account, the Humboldt Agreement required ERIC to deposit funds to cover the shortfall into the Operating Account within five business days after Humboldt made the interest payment. If ERIC failed to reimburse Humboldt in full each month, Humboldt could declare an Event of Default under the TDA.

34.     Humboldt was entitled to draw down on the $135,000 "Interest Reserve" in the Interest Account as a way of replenishing the monies that were drawn on the Primary LOC by the Trustee each month for interest payments, but ERIC's failure to reimburse Humboldt by the fifth day of each month was grounds for Humboldt to declare an Event of Default under the TDA.

35.     Therefore, Humboldt was always assured of receiving full reimbursement each month for any draw on the Primary LOC for interest payments because it controlled, and had a security interest in, the $135,000 "Interest Reserve" that ERIC was required to place in the Interest Account as a condition precedent of the credit facility becoming operative. The $135,000 "Interest Reserve" was large enough to cover several months of missed interest payments.

36.     According to § 2(b) of the Humboldt Agreement, ERIC was required to separately pay $150,000 as a fee to Humboldt for serving as the primary credit facility. The fee was to be paid prior to or on the actual closing date (May 21, 2002).

37.     In summary, ERIC was required to find sufficient funds from whatever source available to pay the monthly interest to the Investors by the fifth business day of each month, or there would be an Event of Default under the TDA and the investment would promptly end. ERIC's obligations under the Humboldt Agreement continued to be the same after the Amendment.

### Effect of Event of Default

38.     The TDA specifies that under an "Event of Default," the principal amount of the Shares becomes immediately due and owing as well as interest accrued as of the Event of Default.

39.     The TDA specifies that interest ceases to accrue immediately upon an Event of Default. The immediate cessation of interest upon an Event of Default differs from other events under the TDA. As to those events, interest continues to accrue following a notice period for a

Mandatory Purchase Date, and Optional Tender Date or the Optional Redemption Date. The notice provisions would allow the Investors to continue to collect accruing interest while winding up the investment and seeking a new investment.

**The Amendment**

40.     In the summer of 2002, ERIC requested that the structure of the Initial Offering be changed to eliminate the credit facility on the principal amount of the Shares because of the high cost.  Under § 2(b) of the Humboldt Agreement, Humboldt would return $75,000 of the $150,000 fee it charged to serve as the primary credit facility if ERIC could set up an Alternate Credit Facility.

41.     SAL modified the structure under the Initial Offering so as to eliminate the Primary LOC and Confirming LOC on the $15,000,000 principal.  SAL proposed that the principal be held with U.S. Bank as trustee.

42.     SAL approached Goetz and requested that the terms under the Initial Offering be amended.  The Investors' consent to the proposed amendment was required.

43.     Goetz, on behalf of the Investors, agreed to the Amendment, and the Investors each executed a Notice of Consent and Waiver of Tender on September 18, 2002.

44.     Prior to the Investors executing the respective Notice of Consent and Waiver of Tender, no additional disclosures were made by SAL or ERIC, ERAC, Olsen or Ross.

**The Structure Under the Amendment**

45.     In addition to removing the credit facilities on the $15,000,000 principal amounts, the Amendment changed the Initial Offering in several ways.

46.     The Amendment expanded the definition of "Permitted Investments."  The definition of "Permitted Investments" now included "Obligations of…commercial banks, insurance companies or other financial institution [sic.] organized and doing business in the United States; or a branch or agency of a foreign commercial bank located in the United States and subject to regulation…which obligations are rated *investment-grade* by Moody's…"

47.    "Investment-grade" under the Moody's rating system can include investments rated as low as "Baa3," or two full credit levels below Moody's new rating of the Amended Shares (i.e., "AA").

48.    Section 4.7 of the TDA (which remained unchanged under the Amended TDA) provides the following powers of the "Account Manager:"

> *[ERIC] shall have the right, within its sole discretion*, to designate an account manager or account managers for the Interest Payment Account and the Share Purchase Account (the 'Account Manager')…The *Account Manager shall have the right to (a) designate the Permitted Investment* in accordance with Section 4.6; (b) withdraw or cause the withdrawal of the Accumulated Interest.

Ex. 19, § 4.7 (emphasis added).

49.    Section 4.6 of the TDA provides:

> Moneys held as part of the Interest Payment Account and the Share Purchase Account *shall be invested and reinvested in Permitted Investments as instructed by the Account Manage*r; provided, however, that: (a) any money from a drawing under a Credit Facility and any moneys held by the Trustee to pay the Purchase Price of or interest that become payable with respect to the Agreement…The *Trustee shall not be responsible for any depreciation in the value of any Permitted Investment or for any loss resulting from such sale*, so long as the Trustee performs its obligations hereunder in accordance with the provisions of Section 7.1(e).

Ex. 19, § 4.6 (emphasis added).

50.    ERIC selected Olsen as the Account Manager.

**FACTS REGARDING STERNE AGEE'S ROLE**

51.    SAL agreed to be the Placement Agent for the ERIC Trust Preferred Redeemable Stock Series 2002A (the "Shares") and was responsible for placing the Shares with an accredited institutional investor once their structure was finalized.

52.    SAL attempted to determine if it could place a stock that actually traded like debt and had the following debt features: the ability to be collateralized; a stated maturity date; regular interest payments; a call feature that allowed the issuer to redeem the security before

maturity; a demand feature allowing the investor before maturity to return the security and receive the full amount he paid for it; and at least an "AA" Moody's rating.

53.     SAL had discussions regarding such a security with John Goetz, who possessed extensive institutional investment experience and worked for the Fort Washington Advisors [Inc.] ("FWA"), serving as investment adviser to, and an agent of, the Investors Touchstone Investment Trust Money Market Fund ("Touchstone") and Western-Southern Life Assurance Company ("W-S") (collectively the "Investors") who eventually purchased the Shares.

54.     The recommendation to the Investors to purchase the Shares was made by FWA, through Mr. Goetz, not by SAL.  FWA was (and is) a professional registered investment adviser company whose role is to make evaluations of proposed investments and recommendations to its client funds as to buying such investments and pursuant to authority given to purchase such investments.

55.     Under the Confidential Private Offering Memorandum ("CPOM") and the Placement Agreement, SAL was the "Placement Agent," and was to be compensated with a placement fee not to exceed two (2) percent of the Share proceeds, which fee would not be paid from the Share proceeds.

56.     As found below, the CPOM explicitly advised Mr. Goetz, his counsel and the Investors of the very limited role that Sterne Agee was carrying out, which did not include (a) evaluation, (b) due diligence, or (c) recommendation to invest.

**ALLOCATION OF RESPONSIBILITIES AS TO REVIEW AND DILIGENCE**

57.     In May 2002 and presently, Mr. Goetz was a sophisticated "investor," as were the institutions that he and FWA advised – including Touchstone and W-S.

        a.     By 2002, Mr. John Goetz had extensive institutional investment experience,

including over 20 years of experience with private placements of securities.

    b.   Goetz had worked as the senior portfolio manager for FWA since 1999 and been a portfolio manager since 1981.

    c.   In spring 2002, Goetz managed around 15 accounts with total assets between $1-2 billion.

    d.   Goetz was also a Chartered Financial Analyst ("CFA"), a member of the worldwide association of investment professionals.

58.    Mr. Goetz worked with SAL on several occasions and their interaction primarily involved variable rate demand notes ("VRDN's").

59.    The Shares were sold as a private placement and not a registered security.

60.    In private placements, parties can and do negotiate or agree who is going to do particular tasks.

61.    At trial, Mr. Goetz confirmed that SAL provided him whatever information he requested, he had no reason to believe that SAL would not have provided whatever information he requested, and SAL never declined to provide him requested information.

62.    The CPOM under which the private placement was made was the culmination of several months of SAL's negotiations between ERIC, the Investors, USB and Moody's. The CPOM was finalized after negotiations regarding the terms of the Trust and Deposit Agreement ("TDA"), the Letters of Credit ("LOC") and Moody's requirements.

63.    The CPOM not only set forth the information that was material to the investment, including detailed summaries and description of the financing structure, but it also stated what obligations SAL had and had not undertaken in its role as the Placement Agent, as well as what diligence the Investors (Investors) were expected to perform.

64.     The CPOM at page 2, advised Mr. Goetz, his counsel and his Investors to use their own counsel and investment advisers to do due diligence and review and evaluate the offering: "IN MAKING AN INVESTMENT DECISION REGARDING THE SHARES OFFERED HEREBY, PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED." (Id., 2nd paragraph.) "EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN COUNSEL, ACCOUNTANT  AND OTHER ADVISORS AS TO LEGAL, TAX, BUSINESS, FINANCIAL AND RELATED ASPECTS OF A PURCHASE OF THE SHARES."  (Id., 4th paragraph.)  Mr. Goetz read and understood such provisions.  The Court finds that in the actual course of dealings in April and May 2002, Mr. Goetz and his counsel and the Investors, in their Finance Committee, accepted, agreed to, and followed such allocation of responsibilities.

65.     Mr. Goetz and his counsel (who also reviewed the CPOM), in their course of dealing with SAL on this transaction, were advised (and read the disclaimer) that SAL was not undertaking itself to conduct any due diligence investigation, and was making no representation as to the "accuracy" or as to the "completeness" of the information in the CPOM, as stated in the CPOM at page 2:  "STERNE, AGEE & LEACH, INC. HAS NOT MADE ANY INVESTIGATION WITH RESPECT TO SUCH INFORMATION, AND NO REPRESENTATION OR WARRANTY IS MADE BY STERNE, AGEE & LEACH, INC. AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION." (Id., 4th paragraph.)  The same type of disclaimer and warning was also made at page 3 of the CPOM: "ALL OTHER INFORMATION SET FORTH HEREIN HAS BEEN OBTAINED FROM THE CREDIT OBLIGOR AND OTHER SOURCES WHICH ARE BELIEVED TO BE RELIABLE

BUT IS NOT GUARANTEED AS TO ACCURACY OR COMPLETENESS BY, AND IS NOT TO BE CONSTRUED AS A REPRESENTATION BY, THE PLACEMENT AGENT." The reader of the CPOM was also warned on page 2 not to rely upon oral representations: "NO DEALER, BROKER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED BY THE ISSUER OR THE PLACEMENT AGENT TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS, OTHER THAN THOSE CONTAINED IN THIS OFFERING MEMORANDUM, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE ISSUER OR THE PLACEMENT AGENT." (Id. at 5th paragraph.) SAL further disclaimed any evaluation of information provided in the CPOM or otherwise than in the CPOM, at p. 13: "Sterne, Agee & Leach, Inc. has not been retained to pass upon any information in this CPOM, including information included herein relating to the Issuers or the Credit Issuers, or in any other reports, financial information, offering or disclosure documents or other information pertaining to the Issuer, the Credit Issuers or the Shares that may be prepared or made available by the Issuer, the Credit Issuers or others to the prospective purchasers of the Shares or others." Mr. Goetz read and understood such provisions, and that Sterne Agee was limiting the scope of its own undertakings. The Court finds that in the actual course of dealings in April and May 2002, Mr. Goetz and his counsel and the Investors understood, accepted and, without objection, agreed to SAL's limitation of its role, and governed their own reviews of the financing in the light of such allocation of responsibilities.

66. Mr. Goetz, his counsel, and his Investors, were explicitly advised by the CPOM not to rely upon ERIC (and that includes the management who operate ERIC) in any way to meet the obligations of the Shares they were being offered, and express disclosures were made as to

the kinds of Issuer-related information that was not being provided to them, as follows, all as relevant to the factor of "non-reliance":

    a. "No financial or operating information with respect to the issuer is included herein";

    b. "Purchasers of the Shares should make their own decision to invest in the shares solely upon their assessment of the creditworthiness of the Primary Credit Issuer and the Confirming Credit Issuer." ;

    c. "No attempt is made in this Offering Memorandum to describe the Issuer in a manner that would enable purchasers of the Shares to assess the creditworthiness of the Issuer" ;

    d. "Accordingly, in deciding whether to purchase the Shares, potential investors should not rely upon the ability of the Issuer to make the required payments under the Indenture.";

    e. "PROSPECTIVE PURCHASERS OF THE SHARES SOULD LOOK ONLY TO THE CREDIT FACILITY AND NOT THE CREDIT OF THE ISSUER AS THE SOURCE OF PAYMENT OF THE PRINCIPAL OF, INTEREST ON AND PURCHASE PRICE OF THE SHARES.";

    f. "ACCORDINGLY, PROSPECTIVE PURCHASERS OF THE SHARES SHOULD LOOK ONLY TO THE CREDIT FACILITY AND THE FINANCIAL POSITION OF THE CREDIT ISSUER AND NOT THE CREDIT OF THE ISSUER AS THE SOURCE OF PAYMENT OF THE PRINCIPAL OF, INTEREST ON, AND PURCHASE PRICE OF THE SHARES."

    67.    Mr. Goetz, his counsel and the Investors were explicitly advised by the CPOM to

review and evaluate the Risk Factors it contained:  "IN MAKING AN INVESTMENT

DECISION, INVESTORS SHOULD CAREFULLY REVIEW THE RISK FACTORS

CONTAINED IN THE SECTION ENTITLED 'RISK FACTORS' HEREIN."  The Court finds

that in the actual course of dealings in April and May 2002, Mr. Goetz and his counsel and the

Investors accepted and agreed to such warning and governed their own reviews of the financing

in the light of such allocation of responsibilities.

68.    Mr. Goetz, his counsel, and his Investors, were explicitly advised by the CPOM

of Risk Factors bearing on management and control of ERIC, in addition to the non-reliance and

non-disclosure warnings set forth in Findings above:

    a.    "The Issuer was incorporated in March 2002.  Accordingly it has no operating

        history upon which you can evaluate its prospects."

    b.    "Our officers and directors will continue to have substantial control over Eel

        River Investment Company after this offering."

    c.    "Accordingly, ERAC will have significant influence over the election of directors

        and matters submitted to a vote of its [ERIC's] shareholders."

    d.    "As a result, these stockholders [of ERAC] will possess significant influence over

        the Issuer, with the ability to significantly influence all matters requiring approval

        by its stockholders."

69.    Mr. Goetz, his counsel and his Investors were explicitly advised by the CPOM

where they could go to obtain further information not already presented in the CPOM, see page

7:  "For more information regarding ERAC, the Issuer or this Confidential Private Offering

Memorandum, please contact:  Veril L. 'Buck' Olsen" [listing his Olympia WA address and

phone and fax].  Mr. Goetz and his counsel did not deem it necessary to avail themselves of

such due diligence procedure.

70.     Mr. Goetz, his counsel, and his Investors, were explicitly advised by the CPOM of the scope of the bankruptcy opinions that would be provided, none of which made "bankruptcy remote" or "independence of directors" an issue.

a. "The Issuer will provide an opinion of Counsel for the Issuer that the payment of the Purchase Price and Interest pursuant to the Credit Facility will not constitute a voidable preferential payment pursuant to Section 547 of the Bankruptcy Code, or a voidable post-petition transfer pursuant to Section 549 of the Bankruptcy Code, recoverable from holders of the Shares pursuant to Section 550 of the Bankruptcy Code in the event of an Act of Bankruptcy."

b. "All such descriptions are further qualified in their entirety by reference to bankruptcy and similar laws relating to or affecting generally the enforcement of creditor's rights and to general principles of equity."

c. Under "Legal Matters," the CPOM again describes the scope of the Stoel Rives firm's no-preference opinion under §§547, 549, 550 of Bankruptcy Code.

71.     Despite having in their possession a draft Stoel Rives firm opinion, sent April 9, 2002, which specifically referred to various categories of corporate documents which counsel deemed relevant to its proposed opinion, Mr. Goetz and his counsel did not ask for copies of the following:

a. Articles of incorporation of ERIC;

b. Minutes of meetings of ERIC, including organizational meeting of its directors dated March 29, 2002;

c. Written consents of ERIC directors, executed in lieu of holding meetings.

72.     The "independent director" provisions of the Articles were summarized in the Stoel Reeves draft opinion sent by email on April 9, 2002 to Mr. Goetz.

73.     The Court finds that if Mr. Goetz had deemed such matters, including the "independent director" topic and identity of the directors, to be material to his evaluation of the VRDN securities here involved, he knew such issues existed and had every reasonable opportunity to request copies of such corporate documents for his and his counsel's review, and that Mr. Goetz and his counsel did not make such requests.

74.     Mr. Goetz recognized that the warnings in the CPOM should be taken seriously and not ignored.

75.     Mr. Goetz understood that he was to look only to the Credit Facility and not the issuer as the source of payment for the interest and principal on the Shares.

76.     The CPOM sufficiently warned the Investors and Goetz that they must rely on their own evaluation of the Issuer [ERIC] and the terms of the offering including the merits and risks involved, and in fact Mr. Goetz and the Investors relied upon their own evaluation.

77.     The CPOM also sufficiently informed Mr. Goetz and the Investors that they should obtain advice from and rely on their own legal counsel and financial, business and tax advisors.

78.     Mr. Goetz understood that the CPOM should not be construed as legal, business, or tax advice.

79.     Mr. Goetz and the Investors in fact were provided legal advice, reviews by counsel, and legal representation by Jonathan Niemeyer and Don Wuebbling.

80.     Messrs Goetz, Niemeyer and Wuebbling were parties to internal communications at Ft. Washington Investment Advisors which discussed whether they should retain outside

counsel in the State of Washington; they elected not to do so because the structure changed from having the funds to secure the investment in the Touchstone Fund to the Final Structure that involved the Credit Facility.

81.     The financing structure changed between April 17, 2002 and May 10, 2002, as the result of negotiations and discussions among the working group parties, including Mr. Goetz and his counsel.

82.     The CPOM also informed Mr. Goetz and the Investors that the information provided in the CPOM had come from the issuer (ERIC) and that SAL, which was serving as the Placement Agent and Remarketing Agent, had "not made any investigation with respect to such information" and was not making any representation as to the accuracy or completeness of the information.

83.     Accordingly, Mr. Goetz knew, that as the CPOM provided in writing, SAL would not perform due diligence on ERIC.

84.     Messrs Goetz, Niemeyer and Wuebbling were also parties to internal communications at their end which discussed whether they should conduct "due diligence" on ERIC and its management, especially in light of SAL's disclaimers of not doing due diligence.

85.     They elected not to conduct this "due diligence" because "the structure of the deal changed and the credit support changed to provide a letter of credit, and the standby letter of credit [the Credit Facility]" to back the issue.

86.     Once the structure of the deal was changed so that the Shares were backed by the Credit Facility, the focus of Messrs Goetz, Niemeyer, Wuebbling and the Investors changed to reviews of the CPOM, the TDA, the letters of credit, and the opinions of counsel.

**DISCLOSURES OF FACTS NOT DISCLOSED ("DISCLOSED NONDISCLOSURES"),
AND NON-RELIANCE AND
LACK OF JUSTIFIABLE RELIANCE**

87.     As noted above, because the Credit Facility and not ERIC was backing the Shares, the CPOM not only informed Mr. Goetz and the Investors that ERIC was a start-up entity with no operating history, it also informed them that no financial or operating information of ERIC was being included and that no attempt was being made to describe ERIC in a manner that would enable purchasers of the shares to assess its creditworthiness or its ability to effect payment of the Share obligations from its own resources.

88.     It was therefore disclosed by the CPOM's language and structure that no attempt was being made to provide the identities of, or information about, ERIC's management or directors, or ERAC's management or directors.

89.     Goetz bought the shares knowing that the CPOM made no attempt to describe the Issuer (ERIC) or its management or their ability to effect payment of the Share obligations from its own resources.

90.     In addition, the CPOM on its face gave no information, nor undertook to list information, about ERIC's officers and directors.

91.     Prospective purchasers of the Shares were explicitly and repeatedly told not to look to ERIC but, rather, to look only to the Credit Facility and to the financial position of the credit issuers (Humboldt Bank and Federal Home Loan Bank of San Francisco) as the source for payment of principal and interest on the Shares.

92.     The CPOM had specific warnings about the influence and control of ERIC by its parent, ERAC.

93.     On page 7, the CPOM offered Mr. Goetz and the Investors the opportunity to ask further questions about ERAC, ERIC or ERIC's management, officers, and directors  and provided the name and contact information for Mr. Olsen to obtain such answers, if they had questions.

94.     Mr. Goetz and the Investors made no such inquiries.

95.     Olsen testified he would have provided additional information, via referring such inquiries to attorney Ross to answer, if he had been asked.

96.     Even though the CPOM, on its first page, disclaims any intention to provide information about ERIC (which would include information about its management), and expressly states that investors should not rely upon any information about ERIC itself, the Investors went ahead with their purchase of the Shares under such stated disclosure conditions.

97.     In the transaction at issue here, Mr. Goetz and his clients were seeking an investment in such VRDN's, which are "loans with some credit support, credit backing that are used as liquid investments in cash portfolios."

98.     The issuer of a VRDN generally does not have the required short term ratings, therefore, VRDN require a credit facility, which replaces the financial risk of the issuer with that of the credit facility.

99.     It is also very important that the VRDN have a Moody's or other rating, like these Shares did.

100.    It is normal for VRDN issuers to have a negative cost of carry, i.e., for the issuer to pay a higher interest rate to the holder of the bond than the issuer can get on any investment of the sums invested in the bond.

101.    Goetz was not concerned with the negative cost of carry in the subject transaction

because under the final structure such costs were covered by the line of credit; thus it was the problem of the line of credit issuer, not Goetz or the Investors, to cover any negative carry.

102. The market for VRDN is limited to accredited institutional investors and their investment advisors who advise and manage money market funds, many of whom, like Mr. Goetz, have over a billion dollars in their portfolio; and such market does not include small, unsophisticated investors.

103. There is no secondary market for VRDN's and, like the Shares, they are priced so that when the investor tenders the bonds back to the remarketing agent, it receives the full price of the bonds, plus accrued interest.

104. The material issues for variable rate structures such as VRDN's are: what guarantees payment of principal; what guarantees payment of interest; can you get a bankruptcy preference opinion on the source of funds that guarantees principal and interest; if the investment will be rated, what rating it will receive; and will anything impede the ability of the protection for the investment to be drawn upon to pay the investors.

105. Except for the name "stock," the Shares had all the features of a VRDN. Accordingly, the parties to the transaction treated the Shares as a VRDN, not a stock.

106. Mr. Goetz was looking for a VRDN.

107. SAL marketed the Shares as a VRDN.

108. In contrast to the normal take-it-or-leave-it offering, because of the chance to get an improved yield with these Shares, Mr. Goetz was willing to engage in a negotiated transaction, involving communications back and forth over a large span of time.

109. In the period preceding closing of the purchase of the Shares, Goetz read the Ross firm opinion and reviewed the Stoel Rives opinion.

110.     The Investors and Goetz were represented by at least two attorneys, Don Wuebbling and Jon Niemeyer, both of whom reviewed the investment, its structure, its documentation and other aspects.

    a.   Goetz presented all the documents he received regarding the offer to his lawyers at Western & Southern and consulted with his lawyers regarding the same.

    b.   At least two drafts of the CPOM disclosure document were sent to Goetz and his lawyer, Niemeyer, suggestions were made, and issues were marked up on the CPOM.

    c.   In addition to telephone communications, numerous emails, faxed items and written transmittals (by attachments to emails and faxes) of draft transaction documents (including forms of approving legal opinions and CPOM drafts) were sent to Goetz and his lawyers during the period of more than two months while the financing structure was being created and then changed, including these dates in 2002:  February 19; April 1; April 2; April 8; April 9; April 11; April 19; May 10; May 14; May 17 (several emails with attachments); May 20; May 21.

111.     As part of those negotiations:

    a.   Andrew Whitehead contacted Goetz with a "rough outline" of the VRDN issue, so that they could begin "to discuss different options and so forth."

    b.   SAL and Goetz discussed changes in the structure of the deal that the Investors wanted and SAL then relayed these suggestions to ERIC.

    c.   What Goetz and ERIC agreed to became part of the final structure.

    d.   The Investors, ERIC, SAL, Michael Ross, and USB were all involved in the formulation of the final structure of the Shares.

    e.   Goetz negotiated the terms of the issuance with SAL, including but not limited to the interest rate, reset or remarketing period, and tender option period.

    f.   Ross drafted the TDA and the CPOM.

    g.   USB received drafts of the TDA and the CPOM, which Brian George and his supervisor reviewed.

112. Initial discussions considered whether the sale proceeds, used to secure the Investors' investment, could be placed into one of Touchstone's money market funds.

113. Putting the funds into one of Touchstone's funds was unacceptable to ERIC because it would tie the funds up for two years.

114. The Investors, ERIC, SAL, Ross, and USB later decided that the security for repurchase of the Shares would consist of an irrevocable letter of credit from Humboldt Bank with an irrevocable standby letter of credit from the Federal Home Loan Bank of San Francisco (collectively the "Credit Facility"). This credit protection gave the Shares a high quality AAA/P-1 Moody's rating.

115. Under this final structure for the Shares, ERIC was out of the picture except nominally as the issuer.

116. Once the decision was made to utilize the Credit Facility, the Investors' focus was on the documents that related to the protection of their investment – the Credit Facility – including: the LOC's; the legal opinions that the LOC's were binding on the issuing banks; the TDA; and the opinion of bankruptcy counsel.

117.    The Investors did not ask about the business plan for ERIC, the identity of ERIC's directors or managers or to see ERIC's Articles of Incorporation.

118.    Moody's, which gave the Shares its highest rating – AAA/p1 also received and reviewed the structure documents – the CPOM, TDA, letters of credit, the opinions of counsel for the letter of credit issuers, the bankruptcy opinion, and the opinion of issuers counsel.

      a.    Before it rates a security, Moody's does such a review to see if the holder will receive timely payment of principal and interest and to determine the quality of the credit standing behind the security.

      b.    Moody's did not ask any questions about ERIC's officers and directors, Olsen, or the financials of ERIC or ERAC.

119.    The final structure of the Shares using the Credit Facility was the result of working group member negotiations among the issuer, the investor, SAL and the rating agency concerning the issuer's needs, the investor's needs and the rating agency's requirements.

120.    Under the final structure, the Investors would receive variable-rate quarterly interest payments, the amount of which would be reset each quarter, and they had the ability to require the repurchase of their investment for the full purchase price plus accrued interest for any reason, at any given quarter.

121.    The final structure provided the Investors with a very secure and highly-rated investment with an acceptable return.

122.    The structure of the Shares provided that the funds to repurchase the Investors' Shares would not come from ERIC, but from the Credit Facility in the event the Shares were tendered.

123.    The Shares were designed and structured to be as secure as the Credit Facility.

124. The material issues related to the Shares, none of which concerned Olsen History, were: the irrevocable LOC's from Humboldt and the FHLB-SF for $15,153,000.00 each; the Stoel Rives bankruptcy opinion that the repayment of principal and interest would not constitute voidable preferential payments or transfers that would be recoverable from the Investors; and Moody's rating the structure AAA/P-1.

125. Mr. Goetz and the Investors were not looking to Olsen or ERIC to repay the debt.

126. The Investors decided to invest in the Shares based solely on the credit support – the Credit Facility – and would not have bought the Shares but for such credit support.

127. The Investors were not buying ERIC and were not concerned with ERIC; rather, they were relying on the Credit Facility.

128. Whether or not ERIC itself was unconditionally obligated to pay for the Shares if tendered was not even a factor in the Investors' decision to buy the Shares.

129. It made no difference to the Investors who the issuer (ERIC) was, or who controlled ERIC.

130. Based on the Credit Facility, the Investors determined that the Shares posed a minimal credit risk.

131. The Investors purchased their Shares on May 21, 2002.

132. Touchstone purchased $2 million and W-S purchased $13 million.

133. W-S later transferred $10 million of its Shares to Touchstone for $10 million in cash.

134. The terms of what the Investors bought were set out in the CPOM and the TDA.

135. As of the May 21, 2002 sale, the representations of the CPOM and TDA material to the Investors' investment decisions were entirely true.

136. As of May 21, 2002, USB held an Irrevocable Direct-Pay Letter of Credit from Humboldt and an Irrevocable Standby Letter of Credit from FHLB, each in the amount of $15,135,000, constituting the security for the Shares, to be drawn upon to pay the Investors the full purchase price they paid for the Shares plus accrued interest in the event the Investors tendered the Shares or in the event that ERIC repurchased them.

137. Given the structure of the Shares, the Investors' risk was that both Humboldt and the FHLB-SF would be unable to stand behind their LOC's and Olsen, who was not securing the investment, was simply irrelevant.

138. SAL was entitled to rely upon advice of counsel, including the Ross Williamson law firm and the Stoel Rives law firm.

139. The Investors were sophisticated investors who negotiated the terms of the Shares to meet their investment needs.

140. The Investors' investment in the Shares was protected by the high-quality Credit Facility.

141. The Investors had the ability to but decided not to conduct due diligence on ERIC.

142. The Investors were not concerned with ERIC or Olsen because they were not buying ERIC but were buying the credit support for the Shares.

143. Even after knowing that Mr. Ross was a director, the Investors did not care, given the credit support for the Shares.

144. There is no testimony or proof that any statement actually and affirmatively made in the CPOM was untrue.

## THE ERIC 2003 SECURITIES

145.     In April 2003, ERIC issued another VRDN offering for $110 million, the Eel River 2003A Securities (the "ERIC 2003A Securities"), which was structured almost exactly like the Shares were after the $15 million collateral for the Shares was transferred to USB.

146.     Due to the size of the offering, Womble Carlyle Sandrige and Rice ("Womble"), a large regional firm, served as special structure counsel to ERIC, while Ross remained counsel for ERIC and SAL had its own counsel – Balch & Bingham ("Balch").

147.     The ERIC 2003A Securities were also governed by a Trust Deposit Agreement with Indenture Provision; USB was the Trustee; the proceeds for the 2003A Securities were used to secure the investor's investments; the proceeds could only be invested in a limited number of Permitted Investments, including the Initial Deposit Account at USB; and USB, as Trustee, had to hold or control all Permitted Investments.  2003 TDA.

148.     Womble drafted a Confidential Private Offering Memorandum for the 2003A Securities, which explicitly told prospective investors not to look to ERIC but, rather, to look only to the credit facility as the repayment source of the purchase price and interest on the investment and noted that no financial or operating information with regard to ERIC was included.

149.     The purchasers of the ERIC 2003A Securities were Fidelity and USAA.

150.     Like Goetz and the Investors, neither Fidelity nor USAA asked any questions about Olsen or his background.

# ISSUE-RELATED FACTS

## Bankruptcy Protections/Independent Directors

151.    As part of the final structure of the Shares, the CPOM stated that ERIC was to provide an opinion of counsel that the payment of the purchase price and interest pursuant to the Credit Facility upon tender or redemption of the Shares would not constitute a voidable preferential payment that would be recoverable from the Investors under the Bankruptcy Code (the "Bankruptcy Opinion").

152.    Like the CPOM, the TDA mentions the requirement for bankruptcy preference opinions in a number of places, including: the definition of "Eligible Funds;"

153.    As stated in the CPOM, ERIC had engaged Stoel Rives, LLP to provide the Bankruptcy Opinion. At the time of the first proposed structure of the financing, when the proceeds would be invested in Touchstone funds, there were to be two Stoel Rives opinions (one on the "preference" issues and another on the "non-consolidation" issues), and drafts of both such proposed opinions were provided to Goetz and his counsel in early April 2002.

154.    When, initially, it was contemplated the Shares proceeds might be invested in Touchstone shares, Niemeyer, Goetz and Wuebbling considered the need for the Investors to hire their own Washington counsel to provide a "second" bankruptcy opinion, but they determined that such an opinion was unnecessary after the structural change that used the Credit Facility (instead of Touchstone shares) to secure the Investors' investment in the Shares.

155.    Counsel for the Investors considered having a bankruptcy opinion to cover viability of the payment structure, in the event of bankruptcy, to be key to the deal.

156.    Before the structure was changed, SAL had sent Goetz and his counsel on April 9,

2002, a draft Stoel Rives non-consolidation bankruptcy opinion which discussed the 'independent director' provisions of ERIC's articles of incorporation and other matters which relate to a "bankruptcy remote" concept. Yet the CPOM as finally issued, under the credit support structure ultimately adopted, does not mention anything about ERIC having independent directors, let alone stating that the bankruptcy protections for the Shares required ERIC to have independent directors, because with the change in structure, any issue of "non-consolidation" or consolidation in bankruptcy risk was avoided.

157. The final Bankruptcy Opinion was issued by Stoel Rives, LLP and was reviewed by Holder's, SAL and USB.

158. The Stoel Rives Bankruptcy Opinion stated that the payment of the purchase price and interest to the Investors pursuant to the Credit Facility and the TDA upon tender or redemption of the Shares would not constitute a payment avoidable under the Bankruptcy Code if a voluntary or involuntary bankruptcy was commenced by or against ERIC.

159. The Stoel Rives Bankruptcy Opinion involved discussion of key aspects of the structure, including (a) the CPOM; (b) Sections 2.4(f), 2.5, 3.7, 4.1 and 4.3 of the TDA; (c) the Irrevocable Direct Pay Letter of Credit Agreement among ERIC, Humboldt Bank, and USB; and (d) the specimen forms of the Credit Facility in the form of the Primary Letter of Credit from Humboldt and the Irrevocable Standby Letter of Credit from the Federal Home Loan Bank of San Francisco; and (e) the Remarketing Agreement, which were part of the structure for the Shares.

160. As a review of the Stoel Rives Bankruptcy Opinion makes clear, the question whether or not ERIC had independent directors had nothing to do with this key bankruptcy opinion, concerning insulation from "preference" treatment, and the Opinion does not mention

anything about whether or not ERIC had independent directors. Had Mr. Goetz or his counsel possessed a real concern about the "independent director" point, they had every opportunity to raise the question, but did not do so.

161.    Moody's, which reviews the bankruptcy opinions and security structures did not ask any questions about ERIC's officers and directors when it rated the Shares.

162.    The Stoel Rives Bankruptcy Opinion specifically covers situations in which ERIC could voluntarily file bankruptcy, as well as being involuntarily placed in bankruptcy, noting that the payments "will not constitute transfers of property of the Company [ERIC] avoidable under Section 547 of the Bankruptcy Code in the event after such payments a voluntary or involuntary case under the Bankruptcy Code is commenced by or against the Company." Any reading of the Stoel Rives Bankruptcy Opinion discloses that, regardless of any provisions of ERIC's articles of incorporation, ERIC was subject to both voluntary or involuntary bankruptcy, and that Stoel Rives was evaluating bankruptcy issues from that perspective.

163.    While Mr. Goetz at trial professed not to have realized the difference between "voluntary" and "involuntary" bankruptcy, he and his organization had the benefit of advice and review of counsel, including review of the very important issues of bankruptcy opinions, and Mr. Goetz's personal lack of recognition of such distinction (which, insofar as the record discloses, was not communicated to SAL) cannot serve to eviscerate the fact that, the potential for ERIC to be placed into bankruptcy (i.e., regardless of "bankruptcy remote" or "independent director" provisions) was fully disclosed. The Court cannot find that justifiable reliance would arise, with respect to the "independent director" issue, given the explicit language of signed opinions delivered at closing to Mr. Goetz and the Investors, and their counsel.

164.    No person or entity has ever raised any issue with the adequacy or

appropriateness of the Stoel Rives Bankruptcy Opinion.

165.    Nor is there any evidence that Mr. Goetz, the Investors or their counsel ever raised any issue with the fact that the Stoel Rives Bankruptcy Opinion explicitly states that ERIC could put itself into bankruptcy, as well as the fact that other persons, besides ERIC (through its own directors), could put ERIC into involuntary bankruptcy.

166.    In September 2002, collateral for the debt changed in that the $15 million principal amount of the Shares was no longer secured by a letter of credit, but was now secured by Permitted Investments held by or controlled by USB.  A new bankruptcy preference opinion was needed.

167.    Shulkin Hutton issued that opinion which opines that $15 million held in Trust by USB under the TDA are exempt from the automatic stay provisions of the Bankruptcy code.

168.    Like the Stoel Rives Bankruptcy Opinion, the Shulkin Hutton opinion does not mention independent directors.

169.    The structure of the similarly structured ERIC 2003 Securities also required a bankruptcy opinion that payment of the purchase price and interest pursuant to the credit facility for those securities would not constitute a voidable preferential payment or an avoidable post petition transfer recoverable for the holders of those securities. See CPOM for 2003 ERIC Securities.

170.    Womble issued the bankruptcy opinion for the 2003 Eric Securities.

171.    Like the Stoel Rives Bankruptcy Opinion, the Womble opinion specifically addresses situations in which ERIC could place itself into voluntary bankruptcy or be placed into an involuntary bankruptcy.

172.    Womble, which was special structure and bankruptcy counsel for the similarly-

structured 2003 Securities, knew that Ross was an ERIC director and ERIC's counsel, yet it never raised an issue regarding this dual role.

173. No one has ever said that the Womble Bankruptcy Opinion was false or inadequate on the bankruptcy issue.

174. ERIC never filed bankruptcy, and no bankruptcy problem ever arose.

175. To summarize the bankruptcy preference opinion, as finally structured, the Shares were backed by direct-pay letters of credit (where the money would go straight from the letter of credit issuer bank to USB, the trustee, and would not go through ERIC's own hands) and therefore that payment for the Shares upon tender would not be voidable under the bankruptcy laws or subject to an automatic stay.

176. Mr. Goetz and the Investors knew that ERIC was a special purpose entity ("SPE") whose purpose was to enter into the TDA.

177. Mr. Goetz understood that ERIC did not operate any business.

178. He recalls no conversations about how ERIC as an SPE without any operations would end up in bankruptcy.

179. The CPOM, and the bankruptcy opinions of three separate law firms: Stoel Rives, Womble, and Shulkin Hutton do not even mention the issue of independent directors. No one since 2002, and no party in this case, has contended that any of the three bankruptcy opinions was incorrect or inadequate. The Court finds that the three law firms' separately-reached opinions, rendered after having the relevant financing structure and documents before them for review, are the most material evidence that: (a) no matter what the Articles of Incorporation of ERIC provided, such Articles could not prevent ERIC from being dragged into bankruptcy, hence the need for such law firm bankruptcy opinions; and (b) the provisions of the Articles of

Incorporation of ERIC were irrelevant to the issue most important to the Investors, namely, whether the payments of principal and interest on the Shares would be able to be made, regardless of ERIC being put into bankruptcy.

180. Further to the point made in the preceding Finding, having two independent directors was simply not relevant to or part of the bankruptcy protections for the Shares.

181. In addition, prior to the creation of the final structure for the Shares, when it was still being discussed whether the $15 million purchase price for the Shares would be invested in Touchstone, on April 9, 2002, Goetz received a draft May 2002 Stoel Rives non-consolidation opinion which described the "independent director" provisions in ERIC's articles.

182. That draft non-consolidation opinion, which later became unnecessary and was abandoned once the structure was changed to include the Credit Facility, laid out the "independent director" provisions of ERIC's Articles of Incorporation. Goetz reviewed the email and attached draft opinion. An early CPOM draft also discussed such non-consolidation opinion.

183. Despite being informed of the "independent director" provisions in the ERIC Articles of Incorporation, Mr. Goetz and his lawyers never asked questions about those provisions or followed up on who the ERIC directors were. Even when the Shulkin firm bankruptcy opinion, as signed, was received, describing 5/21/2002 unanimous signed consents of ERIC directors, Mr. Goetz and his lawyers did not request to see copies of such consents.

184. Furthermore, the evidence presented at trial establishes that at the time of the sale of the shares in May 2002, Ross and Sullivan met the criteria of independent directors set forth in ERIC's Articles of Incorporation.

185. That criteria stated that:

any person who; (i) is not and for the prior five years has not been (A) a shareholder, officer, director, partner or employee or a significant…independent contractor of the Company, its ultimate parent or any subsidiaries or affiliates thereof…As used herein, the term "significant" means any person described above (i) who, in **the proceeding fiscal year**, **received** **compensation** from the Company, its ultimate parent or any subsidiaries or affiliates thereof, in excess of 5% of such person's consolidated gross revenues **and** who **reasonably expects to receive revenues** from the Company, its ultimate parent or any subsidiaries or affiliates thereof, **in the current fiscal year** in excess of such amount…

Art. 4 (emphasis added).

186.    Because ERIC was created in March 2002 and the Shares were purchased by the Investors in May 2002, in order for Ross and Sullivan to not be independent under this definition, they would have to have received the required compensation in both 2001 (the prior fiscal year when ERIC did not even exist) and 2002 (the current fiscal year).

187.    USB has presented no evidence showing that Ross and Sullivan did not meet the explicit terms of this provision which requires a review of two separate fiscal years.

188.    Rather the evidence USB presented related merely to what Ross and Sullivan received in 2002, the "current fiscal year".

### Michael Ross's Roles as Issuer's Counsel and ERIC Director

189.    When USB first contacted Mr. Goetz in early 2005 before his deposition, Mr. Goetz told USB that the fact that ERIC's attorney Michael Ross was also an ERIC director did not concern the Investors because they were focused on the protection for the Shares created by the Credit Facility at the protection for the Shares.

190.    This admission on the part of Mr. Goetz is consistent with his testimony that the Investors (a) were not buying ERIC; (b) were not concerned with ERIC; (c) did not care who the issuer was; (d) did not care who controlled the issuer; but (e) were instead concerned with the credit support provided by the structure of the deal.

191.     Mr. Goetz further testified in response to the question: "In other words the background of Eel River of who was running Eel River didn't also have an important material affect on your decision to invest in this investment?": "The important thing to get for me was the credit support that was provided in the deal."

192.     Ross's "dual role" was simply irrelevant to the Investors.

193.     In addition, the "dual role" was not relevant to the material issues for VRDN's such as: what guarantees payment of principal; what guarantees payment of interest; can you get a bankruptcy preference opinion on the source of funds that guarantees principal and interest; if the investment will be rated, what rating it will receive; and will anything impede the ability of the protection for the investment to be drawn upon to pay the investors.

### THE WBCA CONTENTION WAS NOT MATERIAL ISSUE
### AND NO JUSTIFIABLE RELIANCE COULD BE PLACED ON SUCH ISSUE

194.     Except for the name "stock," the shares had all the features of a VRDN and were treated by the parties as a debt offering.

195.     Mr. Goetz understood that the Shares were being called stock so that ERIC could make it look like they had assets, but this fact did not cause him any pause.

196.     Mr. Goetz and the Investors viewed the Shares as a "taxable debt offering."

197.     Mr. Goetz understood that the Shares would function as a debt offering.

198.     Mr. Goetz looked at the Shares as a debt offering that was covered by letters of credit.

199.     The Investors referred to the Shares as "bonds".

200.     SAL also referred to the Shares as Bonds.

201.     The Investors bought the Shares at par with no accrued interest.

Order - 38

202.   Moody's also referred to the Shares as Bonds in its rating letter, and assigned the Shares the highest debt-type rating of Aaa/P-1.

203.   The Shares had a CUSIP number that indicated it was debt.

204.   Documents produced by USB show that USB also treated the Shares as a form of debt -- corporate bonds.

205.   The terms of debt obligations are placed in a contract, which creates the debt.

206.   The TDA was the document that set out the contractual terms of the debt aspects of the Shares.

207.   Mr. Goetz understood that the TDA set forth the terms of the Shares and was the most important document for understanding those terms.

208.   For pure debt offerings, there is no filing requirement with the Washington Secretary of State; all the aspects of the debt offering are done contractually.

209.   The Shares were hybrid securities that were predominately debt and were called a stock.

210.   With respect to stock, there needs to be a filing with the Washington Secretary of State that sets forth the number and types of shares authorized and if more than one class of shares is authorized, the relative rights, preferences, and limitations of the class of shares.

211.   The ERIC Articles of Incorporation designated two types of shares – common stock and Trust Preferred Redeemable Stock (the Shares) and the number of each that was authorized.

212.   The only relative right, preference, and limitation of the Shares concerning the minor stock-like aspect of the Shares is that the Shares had no voting power.

213.   The other relative rights, preferences and limitations of the Shares are part of the

debt terms for the Shares and are to be set forth in the TDA.

214. Dividends/interest rights are in TDA Section 2.3; redemption rights are in Section 2.16; and liquidation preferences are in TDA Article 6.

215. Each of these TDA provisions imposed key duties on USB, who was not bound by ERIC's articles:

    a. TDA Section 2.3(f) required USB to draw upon the credit facility for the payment of interest and to take all actions under that facility to ensure the Investors were paid interest;

    b. TDA Section 2.16(b) required USB to authenticate and deliver certain things to the Investors under certain conditions;

    c. TDA Article 6, among other things sets forth duties and obligations of USB in the event of a default.

216. There was not a single Share term of which the Investors and Mr. Goetz were not aware.

217. ERIC's Articles of Incorporation recognized the key role of the TDA.

    a. Article II states that: "The sole Purpose of the Company shall be to establish a trust account subject to a Trust and Deposit Agreement with Indenture Provisions (the "Agreement"), which trust account shall hold the proceeds from the issuance of trust preferred redeemable stock and the quarterly issuance of common stock, and which proceeds shall be used for redemption of the trust preferred stock and to take such other actions as may be permitted or required under the Agreement, and the Company shall have no other purpose whatsoever.

b. Article III, sets forth the "Covenants Regarding Operations, all of which are effective as long as "any obligation is outstanding under the Agreement [TDA]";

c. "Obligation" as used in the Articles refers to the contractual obligations in the TDA, which describe the debt nature of the Shares;

d. The covenants of Art. III repeatedly refer to the TDA, which is called the "Agreement." ;

e. Art. III (g) specifically states that ERIC "may not incur any debt other than as permitted in the Agreement [TDA]."; and

f. Art. XI also sets forth certain requirement that must be met as "any indebtedness is outstanding under the Agreement [TDA]."

218. ERIC's Articles of Incorporation make clear that the purpose of ERIC is to have indebtedness under the terms of the TDA.

219. The TDA itself provides that the Shares are issued under the TDA (as opposed to the Articles of Incorporation): the pertinent definition in section 1.1, on p. 7, reads, "'Share' or 'Shares' means the Eel River Investment Company Trust Preferred Redeemable Stock, Series 2002A authorized under this Agreement."

220. The TDA in section 2.1 further provides that the Shares are issued under the TDA (as opposed to the Articles of Incorporation), stating, "No Shares may be issued under the provisions of this Agreement except in accordance with this article."

221. Under the TDA, the issuance of the Shares, in order to be "valid or obligatory," requires the authentication of USB as Trustee.

222. Under the TDA, USB is a creditor of ERIC, the issuer, holding accounts, moneys

and proceeds pledged by ERIC to USB as "Security" for the Shares.

223.    As relevant to the issue of non-availability to issuers and their creditors of the ultra vires defense to payment of an obligation:  under the TDA, USB as Trustee is vested with the rights and remedies of a creditor, as against ERIC, the issuer.

224.    The issuer, ERIC, never repudiated the obligation of the Shares or asserted that they were unenforceable and ultra vires due to non-compliance with the WBCA.

225.    No one, including any government agency or any court, up through the time of the Investors' tender in September 2004, ever raised any contention that the TDA was not enforceable, or that the Shares were not enforceable, because of any WBCA lack of compliance.

226.    The Ross Firm gave an unqualified opinion at closing that all necessary filings had been made under Washington law, and it was not the practice of Mr. Goetz or the Investors to go behind such an unqualified closing opinion of counsel.

227.    When it came time for the Investors to get their money back no one informed them that the TDA was not fully enforceable because of some aspect of Washington corporate law.

228.    The response of USB to Goetz's demand letter in Sept 2004 was not to raise invalidity or unenforceability of the Shares or the TDA due to WBCA lack of compliance, but, instead, to honor it by paying $15M and taking an assignment of its rights; the Investors were fully paid.

229.    There is no evidence in the record that alleged failure to properly issue the Shares: (1) had any effect on the enforceability of the TDA as Amended under contract law; (2) had any effect on the Holder's ability to tender and receive full payment for the Shares; or (3) caused any damages to the Investors.

230. The Ross Opinion Letter states that the TDA and the other Issuer Documents constitute legal valid and binding obligations of ERIC and are enforceable against ERIC according to their terms.

231. Having obtained the benefits of the TDA and the Shares, had ERIC tried, which it did not, to challenge the validity of the Shares or the TDA, it would have been estopped from doing so.

232. Given the structure of the Shares, the Investors could have simply tendered their Shares for full par value plus accrued interest for any reason at any quarter, including if they were concerned that certain TDA terms were not in the articles.

233. Upon tender, the Investors would have been fully paid for their Shares, as ultimately happened here.

234. USAA and Fidelity, which held 2003A Securities issued under articles with the same alleged defects, were also paid upon tender.

235. There was no secondary market for the Shares and they were designed to be tendered back to the remarketing agent.

236. The TDA was fully enforceable under contract law.

237. When the Investors demanded payment from USB after they had tendered, the Investors only demanded what they were due under the TDA.

238. Ross issued a valid opinion of issuers' counsel to the Holder's, SAL and USB, which among other things stated that the Shares complied with all state and federal laws and regulation related to their issuance.

239. Moreover, if the Shares were not properly issued under the WBCA, SAL proved the "reasonable care" defense under RCW 21.20.430(3), which provides a defense to broker

dealers who materially aid in the sale of a security, if such person "sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

    a. SAL did not know that the Shares did not comply with the technical requirements of the WBCA and as a placement agent to whom closing opinions of counsel were delivered, SAL had the right to rely upon opinions of counsel, including bankruptcy counsel, issuer's counsel, letter of credit bank counsel, and the certificates and filings of such counsel;

    b. SAL relied upon Ross' opinion that the WBCA and all other state and federal requirements related to the issuance of the Shares had been complied with;

    c. Ross intended for SAL and the others receiving his opinion to rely on it, including Opinions 4 and 5;

    d. USB's expert Murphy testified that the Ross opinion letter was the type of opinion letter that placement agents in the position of SAL would normally receive and rely upon;

    e. Likewise, Mr. Goetz testified that he does not go behind the opinion of closing counsel such as that given by Mr. Ross here; and

    f. SAL's obtaining, as a condition of SAL's involvement, and relying upon the opinion of issuer's counsel was an exercise of reasonable care.

### Olsen's History

240. In the discovery phase of this case, after it was filed, SAL learned that prior to the issuance of the Shares, Stoel Rives had sent Ross printouts of litigation in which Olsen had been involved.

Order - 44

241.    Ross did not send the printouts to SAL nor did he speak to SAL about the printouts, back in 2002, when the financing was being done.

242.    Ross only discussed the Olsen History documents with Olsen and Stoel Rives.

243.    There is no credible evidence that Ross or Stoel Rives or Olsen himself ever informed Sterne Agee of Olsen's History, and Sterne Agee's credible testimony, consistent with the testimony of Ross and Olsen, is that Sterne Agee was not informed.

244.    Ross was aware of the "5 year rule" of the SEC [see, Regulation S-K, 17 C.F.R. §229.401(f)].

245.    Prior to the issuance of the shares, Ross determined that Olsen's only litigation within the 5 years prior to issuance was an immaterial, uncontested, unlawful detainer claim. The additional cases that USB disclosed for the first time at the March 2009 trial proceeding, like the unlawful detainer claim were also immaterial.  For example, Olsen's 1997 DUI was a criminal traffic violation offense for which prosecution was deferred.  His 1999 Assault in the 4th degree charge was a minor offense that was dismissed on a motion by the state.  The claim for unpaid child support filed in May 2002 is also not the type of litigation that is considered material. The August 2002 collection claim for $708.02, is both after the issuance of the Shares and not material.

246.    Ross further determined that the other litigation, including a 12-year-old guilty plea for possession of drug paraphernalia and a 1987 personal and business bankruptcy, was not material.

247.    Like Ross, Stoel Rives, which also knew about Olsen's history, made a determination that such history was, under the circumstances, not material and did not disclose it.

248.    The legal opinions delivered by Ross and Stoel Rives in connection with the closing contained no disclosure of Olsen History.

249.    Olsen's litigation history would not have had to have been disclosed under Regulation S-K, 17 C.F.R. §229.401(f), if the Shares were being sold in smaller units in a registered public offering to non-accredited investors.

250.    Ross made the decision not to disclose Olsen's litigation history because it was not material, given the structure for the Shares and the fact that any risk concerning Olsen was borne by the letter of credit issuers and not the Investors.

251.    Mr. Goetz admitted that under the structure of the Shares that he, too, thought that Humboldt Bank and the Federal Home Loan Bank who had issued the letters of credit that formed the Credit Facility were the ones who were most heavily dependent on the performance of Mr. Olsen, including running the sawmill.

252.    The fact that Humboldt Bank and the Federal Home Loan Bank closed on this 2002 ERIC financing, and issued their respective letters of credit, is some evidence of the fact that such banking institutions did not think that Olsen's History was material to their participation in the deal.

253.    The Investors knew ERIC was a start-up entity with no operating history from which its prospects could be evaluated and that one calendar quarter of interest was guaranteed.

254.    Mr. Goetz understood that he could not and should not rely on Mr. Olsen or ERIC for payment whether it was for principal or for interest.

255.    Consistent with the CPOM's disclaimers and warnings, in making the decision to invest in the Shares, Mr. Goetz did not rely upon the ability of ERIC to make the required payments under the TDA, but instead looked only to the Credit Facility for the payment of

interest and principal.

256. From Mr. Goetz perspective, Mr. Goetz was not concerned with a shortfall on the interest payment as he was relying on the Letters of Credit to cover such payments.

257. Mr. Goetz assumed that the banks issuing the letters of credit had determined whether Olsen had the ability to make the deposits to cover the letters of credit.

258. The concept of "negative carry" and an outline of ERIC plans to handle it was disclosed to Mr. Goetz in the draft Stoel Rives "non-consolidation" opinion that he was sent by SAL on April 9, 2002, and in any event, Mr. Goetz's testimony shows he was not concerned with "negative carry," that instead, he relied upon the letter of credit support.

259. Mr. Goetz did not consider Olsen's ability to service the debt when he made the decision to invest in the Shares.

260. Any expectation that the investment would continue for a significant duration is unreasonable because (1) ERIC rejected the proposed investment of the proceeds in Touchstone's money market fund because it would have tied up those funds for two years; (2) under TDA § 2.16, the Shares had a call feature which allowed ERIC to buy all or a portion of them back from the Investors for any reason at full price at any quarter; and (3) the Investors could tender at any quarter.

261. Mr. Goetz understood the terms of the Shares and knew that ERIC could call the debt before maturity.

262. Instead, Goetz placed his sole reliance on the creditworthiness of those banks issuing letters of credit or acting as Trustee to preserve the financial structure of the deal and information unrelated to those institutions or to the structure or their obligations to the investors, was immaterial to Mr. Goetz and his decision making.

263.    Fidelity and USSA – the accredited institutional investors – who purchased the ERIC 2003 Securities (which had a virtually identical structure to that of the Shares under the Amended TDA) were also told to look at the credit facilities and not ERIC for the source of payments.

264.    Neither Womble nor Balch, the attorney's on the ERIC 2003A Securties informed anyone before the issuance of the 2003A Securities that there was an issue regarding Olsen.

265.    Moody's rated the Shares both at the initial issuance and after the amendment changing the collateral; and also rated the ERIC 2003 Securities.

266.    Before it rates a security, Moody's reviews the credit facility, legal opinions, bankruptcy opinions and the structure to determine if investors will receive timely payment of principal and interest.

267.    Moody's did not ask any questions about ERIC's officers and directors, or Olsen, as Olsen's background was not material to a reasonable investor in such secured securities.

268.    At trial Mr. Whitehead, who like Ross was intimately familiar with the structure of the Shares and the protections it afforded the Investors, testified that he did not believe that Olsen's litigation history was material given the structure and its protections.

269.    Likewise, Mr. Liles testified at trial that Olsen's history was not material.

270.    Although USB's expert Murphy testified that Olsen's litigation history would be material to a reasonable investor, he also testified that he had never worked on any VRDN's while he was an investment banker.

271.    Goetz's concern about the Credit Facility – and not ERIC – is entirely consistent with: (i) the actions of USAA and Fidelity, who bought the ERIC 2003 Shares; (ii) the review of

the structures by Moody's, and (iii) the opinions and or actions of Ross, Stoel Rives, Womble and Whitehead set forth above.

272. The CPOM on its face provides no identities of ERIC board members, ERIC officers, ERAC board members or ERAC officers; such fact was readily apparent to a sophisticated investor like these Investors and their adviser, Goetz.

273. There is no testimony or document showing that SAL actually provided, or undertook to provide, any information about Olsen's History or background.

274. The record shows that Goetz never inquired of SAL about ERIC's directors or managers, including Olsen's History or background, and he closed and effectuated the purchase of the Shares, believing that he received the information he needed, sufficient to make an informed investment decision. Further, Mr. Goetz never talked with Olsen (whose name and number was provided to him in the CPOM as the place to go if he had questions).

275. Even though the CPOM expressly disclosed that directors and control of ERIC could be changed by ERAC, Mr. Goetz did not inquire about such matters.

276. Mr. Goetz, knowing of the provisions of the TDA regarding "permitted investments," knowing (after the structure changed in September 2002) that collateral could go down in value, and knowing that someone other than himself would pick the permitted investments, did not ask himself any questions about Olsen, to whom ability to pick investments was delegated.

277. Mr. Goetz understood there was no advantage to him or the Investors for the VRDN's to have a "stock feature" and they were looking at these securities as being debt instruments, and he understood the people involved in ERIC wanted to portray to the world that they had an asset when they did not, i.e., "show money."

278. After SAL on April 17, 2003 sent Mr. Goetz an email and attached ERIC's Amended and Restated Articles, which lists Ross and Sullivan as ERIC directors along with Olsen, Mr. Goetz raised no concern or question about this fact at any time up through the Investors' tender of the Shares for redemption in September 2004.

279. Further it is not customary in any VRDN offering or VRDN issue for there to be disclosures about the history and background of officers of the issuer and Mr. Goetz has never seen such disclosures done, nor ever asked about management background.

280. In fact, Mr. Goetz does not know if any of the officers of other issues of VRDN's that the Investors have purchased have had personal bankruptcy or assault charges and he never asks to find out if they do.

281. The Shares with their Credit Facility, were a secured investment designed to prevent the loss of the Investors' $15 million and to guarantee payment of accrued interest.

282. Olsen's litigation history was not relevant to the investment decision because under the structure of the Shares, the Credit Facility, not Olsen, guaranteed the payment for principal and interest.

283. The Shares in which Mr. Goetz and the Investors were investing with their Credit Facility had nothing to do with Eel River, and nothing to do with Mr. Olsen, but had everything to do with Humboldt Bank and the Federal Home Loan Bank, who issued the LOC's that formed the Credit Facility.

284. Likewise, when the amendment was made changing the collateral to protect the principal to $15 million on deposit with USB, Mr. Goetz and the Investors were relying on USB, not Olsen or ERIC, to maintain the $15 million on deposit and to make the required principal payments under the TDA.

Order - 50

285.    The Investors received the protection for their investment that they purchased, as USB paid the Investors in full for their investment even though it had released control of the $15 million back in late 2002 to persons in Europe.

286.    Nothing about Olsen's background altered the nature of the Shares.

287.    The Investors, despite any history of Olsen, received what they bargained for in their investment: the minimal risk that the letter of credit banks would default on their obligations and later after the collateral was changed USB's ability to maintain control of the Permitted Investments so that on any quarter they could tender for full value plus accrued interest.

**FACTS RELEVANT TO USB'S ATTEMPTS TO INDEMNIFY ITSELF**

288.    As the facts set forth below make clear, USB relinquished control of the $15 million it had on deposit to secure the principal amount of the Shares, it then paid the Investors in full shortly after they tendered the Shares and demanded payment from USB and it is now seeking to indemnify itself.

289.    SAL was asked in the Fall of 2002 to determine if there was a way to reduce the Letter of Credit fees ERIC was paying, which culminated in the First Amendment to the TDA, the terms of which were negotiated and agreed to by all the parties including the Investors.

290.    One of the key changes to the TDA was the narrowing of the definition of Permitted Investments because the collateral to secure the principal amount of Investors' Shares would no longer be in the form of irrevocable letters of credit, but instead would be in the form of deposits of the $15 million deposited with USB or the investment of those funds in certain limited investments that would still allow the structure to obtain an AA rating from Moody's.

291.    Another important TDA change was the modification of § 3.7 concerning the

Order - 51

Withdrawal Credit Facility, which would secure the funds to repurchase the Shares and which was required to be put in place before ERIC could withdraw any of the $15 million from USB.

292. Pursuant to the First Amendment to the TDA, the Humboldt Bank and Federal Home Loan Bank of San Francisco letters of credit were cancelled and the $15 million of proceeds from the initial sale of the Shares was transferred to USB and placed in the Initial Deposit Account (a part of the Share Purchase Account), which funds USB then held in trust for the Investors to repay the purchase price of the Shares when the Investors tendered them. TDA, § 4.3(c). First Amendment to the TDA, Definitions of "Initial Deposit Account" and "Permitted Investment;" Part 3, "Transfer of Funds by Credit Issuer; § 2.4(f); § 4.3(a).

293. In addition, irrevocable direct pay letters of credit from Humboldt Bank and the Federal Home Loan Bank to USB in the amount of $135,000 were issued to secure the payment of one quarter's interest under the TDA as amended.

294. The deposit of the $15 million proceeds with USB in the Initial Deposit Account was designated a 'Permitted Investment.' First Amendment to TDA, Definition of Permitted Investments.

295. ERIC could appoint an Account Manager who had two limited duties, one of which was to "designate the Permitted Investment in accordance with § 4.6 of the TDA."

296. Pursuant to TDA § 4.6, monies in the Share Purchase Account (which includes the Initial Deposit Account) were to be invested or reinvested in Permitted Investments as instructed by ERIC's Account Manager.

297. Veril Buck Olsen was ERIC's Account Manager.

298. USB's Frank Leslie was aware that the funds could be invested only in Permitted Investments.

Order - 52

299.   TDA § 4.6 explicitly required that "[a]ll Permitted Investments shall be held by or under the control of the Trustee and shall be deemed at all times to be part of the fund and account which was used to purchase the same."

300.   The duty to hold or control all Permitted Investments under the terms of the TDA as amended was USB's explicit duty as Trustee.

301.   Under the terms of the TDA as amended, ERIC could not withdraw funds from the Initial Deposit Account until a Withdrawal Credit Facility was provided. See Amended TDA, Part 3; § 3.7.

302.   After the change in collateral, the Investors were relying on USB as Trustee "to maintain the [$15,000,000] principal on deposit in an investment account pledged solely for the payment of principal on [the Shares]" and were not relying on ERIC to make the required payments under the TDA.

303.   After the change in collateral and the resulting Amendment to the TDA, the Investors still found the Shares to be a good investment.

304.   Mr. Goetz recommended in a memo discussing the change in collateral that the Investors keep the Shares because they had "a very attractive yield for an issue of such high quality."

305.   Until Christmas Eve 2002, the $15 million remained on deposit at USB.

306.   On Christmas Eve morning, Mr. Olsen sent Mr. Leslie a letter with attachments, in which Mr. Olsen, as the ERIC Account Manager, directed USB to send the $15 million to the account of Target International Funds ("Target") at the Banque de Patrimoines Prieves Geneve in Switzerland ("Swiss Bank") so that the funds could be used by Target to purchase a "Societe Generale Bond Fund" or note (the "SG Security"), which "was to be placed in ERIC's Swiss

Bank account."

307.    Olsen's letter stated that the "SG Security" was a Permitted Investment.

308.    Even though Leslie did not have any documents describing the SG Security, had only just heard of Target, and had failed to even look at the Amended TDA to determine if the SG Security was in fact a Permitted Investment, he authorized the transfer.

309.    The employees in USB's Trust Finance Management Department (who prepared the transfer) did not review the Amended TDA to determine if the SG Security was a Permitted Investment.

310.    Although Olsen's letter stated that "USB would have the right to immediately liquidate the purported SG Securities and have a first priority to draw upon the proceeds to pay the purchase price of the tendered Shares," USB did not require what was being purchased to be held in a bank account in the name of USB, or that the proposed security be issued in the name of USB.

311.    USB did not send the money as a DVP – delivery versus payment – trade, whereby USB would not send the $15 million until it had received the securities that were being purchased.

312.    USB complied with ERIC's directions and transferred the money to the Swiss Bank, but received nothing in return for the transfer of the $15 million.

313.    After the transfer, Leslie did not require that the SG Security be delivered to USB.

314.    The entire $15 million was not used to buy the SG Security, as on January 17, 2003, Swiss Bank or Target used $12,445,500 to purchase a zero coupon bond with a face amount of $15 million, which would be worth 120% of the purchase price in ten years.

315.    The SG Security was placed in Target's Swiss Bank account (not USB's) on

January 17, 2003.

316. On February 17, 2003, the SG Security was moved to ERIC's Swiss Bank account and Swiss Bank sent ERIC a receipt showing the deposit.

317. ERIC provided USB with a copy of this receipt, which suggested that $15,000,000 had been placed at ERIC's account at BPP on February 17, 2003.

318. The receipt, which shows that the SG Security was in ERIC's Swiss Bank account did not indicate that the SG Security was in safekeeping for the benefit of USB or the Investors, and USB had received nothing from Swiss Bank acknowledging that it held any sort of lien on or security interest in the SG Security.

319. At the time USB received the receipt, it did not have the ability to prohibit the sale of the SG Security or to prohibit its transfer.

320. Leslie never received any further documentation from Swiss Bank indicating if the SG Security was still in place or if it still had the money.

321. No one at USB ever confirmed with Swiss Bank that the SG Security in ERIC's Swiss Bank account would not be sold.

322. After receiving the SG Securities into its BPP account, ERIC immediately began to liquidate portions of the SG Securities and transfer those funds to its accounts at Humboldt Bank in California and Key Bank in Washington.

323. Thereafter, ERIC transferred the funds to defendants Eel River Acquisition Corporation and Eel River Lumber Products, LLC, to purchase sawmills and to defendant Olsen.

324. In September 2003, USB began clearing securities trades for ERIC (with the $110 million trust funds on deposit with USB from the 2003 ERIC Securities) as long as the trades that settled that day resulted in net positive cash.

Order - 55

325.     Around August 17, 2004, SAL learned from USB officer Leslie about a Penson lawsuit against ERIC, involving allegations of trading of funds that were purportedly held at USB, and by August 20, 2004, SAL became aware that the trading involved the possible use of the $110 million trust funds held by USB on deposit to protect the 2003A Securities.

326.     USB officer Leslie had in 2003 entered into an agreement for an arrangement "on the Eel River trades," using trust funds, that "We [USB] will hold open positions on either buys or sells (as you direct us) until settlement date, which may be as much as 3 days.  Sometime during that time we understand that you will put up the other side so that we have offsetting trades settling on the same day so that the result is no security position.  These trades will only be settled if the net cash for the day is positive."    Such USB arrangement was unknown to SAL or the Investors before August 2004.

327.     SAL notified the Investors, USAA and Fidelity of the lawsuit.

328.     Because the Investors needed to tender 7 days before September 1 or wait to tender until the next quarter, Whitehead suggested to Goetz that the Investors tender the Shares.

329.     The Investors, Fidelity and USAA, tendered their shares for repurchase effective September 1, 2004.

330.     USB as trustee, was able to pay the $110,000.00 to USAA and Fidelity when they tendered their ERIC 2003 Securities, but because it had relinquished control of the $15 million investment for the Shares, USB could not immediately pay the principal and interest owed to the Investors, from funds other than its own.

331.     USB had no control over the $15 million once those funds were transferred to Switzerland.

332.     In fact, USB's trust officer, Leslie did not even know if the SG Security was still

in place.

333.     John Goetz, acting on behalf of his institutional investors, demanded payment from USB as Trustee and informed USB that they believed that USB was in breach of its duties under the TDA, including its duties under § 4.6 of the TDA to hold and control all Permitted Investments.

334.     Goetz believed that U.S. Bank violated §§ 3.7 and 4.6 of the amended TDA by losing control of the investment (§ 4.6) and by not requiring a withdrawal credit facility (§ 3.7) before relinquishing the funds to ERIC.

335.     On September 9, 2005, the Investors sent a letter to USB demanding payment of their tender, stating that they believed USB was in breach of the TDA, and threatening legal action if the tender was not paid.

336.     By the end of September, USB paid the Investors all that they were owed under the TDA, acquired the Shares and took an assignment of any claims the original Investors may have had against those associated with the original offering of the Shares.

337.     Neither USB nor anyone else, in September 2004, informed Mr. Goetz that the TDA provisions were not enforceable because of some aspect of the WBCA.

338.     Paragraph 7(b) of the Stock Purchase Agreements between USB and the Investors required the Investors to keep confidential all information concerning USB's performance as Trustee and Paragraph 7(c) required the Investors to release their claims against USB for its loss of the $15 million.

339.     Schedule 1, item "(f)," of each of the Stock Purchase Agreements expressly preserved to USB the pending, uncompleted September 1, 2004 tenders for redemption of the Shares.

Order - 57

340. USB terminated Leslie for unsatisfactory job performance, in large part because USB was missing $15 million.

341. The 2004 yearly review of Leslie's manager, Jim Ehrenberg, referenced the loss of the $15 million, stating that there had been "a very large extraordinary loss caused by negligence on an individual's part that had impact on corporate trust as a whole."

342. The Shares were worth the $15 million plus interest they were represented to be worth, at the time of initial sale to the Investors on May 21, 2002, taking into account the security in USB's possession at closing. The Shares retained such worth (without regard to USB's own obligation to pay the Shares upon tender), until USB lost control of the collateral for the Shares.

343. Had USB held and controlled the $15 million or the investments made with it, as it was required to do under TDA § 4.6, the Investors would have been promptly paid for their Shares on September 1, 2004 pursuant to their tender, USB would not have had to use its own funds to make such payment, and this lawsuit would never have occurred.

344. Once the Investors' threats were made, USB paid the Investors and obtained releases, which make it clear that USB was buying the Shares to settle the Investors' claims against USB.

345. USB's litigation commenced in October 2004. This suit included a WSSA rescission claim against SAL, from initial filing in October 2004 until May 5, 2006.

346. USB's objective is to come out of this lawsuit with no net loss, and one way to achieve that objective is to shift the entire loss to SAL.

347. USB's lawsuit against SAL is an attempt by USB to indemnify itself for the payments it made to the Investors.

# FACTS CONCERNING THE RUPP MANUEVER

348.     After USB purchased the Shares from the Investors, they remained outstanding, and still remain outstanding, with full rights to tender for redemption.

349.     The Share rights that USB purchased in September 2004 included all rights as a Holder of the Shares and all rights under the TDA and all rescission rights.

350.     After USB purchased the Shares from the Investors, it occupied two capacities relating to the Shares simultaneously – one capacity as trustee with duties under the TDA, and the other capacity on the commercial side, as an owner of the Shares.

351.     Up until the eve of trial, USB's claims against SAL were for rescission under the WSSA.

352.      On April 21, 2006, at a summary judgment motion hearing shortly before trial, in response to questions from the Court, SAL informed the Court that: (i)  if USB prevailed on its claims for rescission, SAL would be a holder of the Shares; (ii) as a holder of the Shares, SAL would have the right to tender and would tender the Shares to USB as trustee for any reason at any quarter for the full purchase price plus interest; (iii) SAL would expect payment of the $15 million that was given to USB as security for the Shares;  and (iv) SAL would sue USB if it failed to make such payment.

353.     In its first response to SAL's point about redemption, USB stated that if it sold the Shares prior to trial that it would be entitled to WSSA damages and that SAL's scenario of putting the Shares to USB as Trustee "only is arguably accurate if rescission is in fact the remedy sought in this action."

354.     On May 5, 2006, USB followed up on its counsel's point, and sold the $15 million principal amount of Shares to Robert Rupp ("Rupp") for $15 dollars cash.

355.     The sale to Rupp took place three days before the May 2006 trial and was documented by a six page purchase agreement.

356.     USB corporate representative Strodthoff admitted that the sale to Rupp took place because of the points that were made at the April 21, 2006 summary judgment hearing.

357.     USB informed SAL of the Rupp sale maneuver on the weekend before trial.

358.     USB transferred the Shares to Rupp to prohibit SAL from making a claim against USB as Trustee if USB were successful in its claim for rescission.

359.     On May 8, 2006, during opening statements of the bench trial USB informed the Court that it was seeking WSSA damages at trial, not rescission, because it had sold the Shares.

360.     SAL objected to the Rupp Maneuver promptly after learning of it, and asserted a motion to dismiss based upon it.

361.     The Court did not rule on SAL's motion to dismiss at such time and gave SAL time to brief the issue.

362.     Before the time came for SAL to brief its motion regarding the Rupp Maneuver, the Court granted SAL's Motion for Judgment as a Matter of Law, during the first trial session.

363.     SAL preserved its objections to the Rupp Maneuver.

364.     At the second trial session, in March 2009, it came out that Rupp was a client of USB's lawyer, and that the lawyer helped USB find a purchaser for the Shares.

365.     Pursuant to its agreements with the Investors, USB was to get the prior approval of the Investors if USB assigned any of its rights, interests or obligations in the Shares unless the assignment was to an affiliate. Rupp was not an affiliate of USB. USB failed to get the

Investors' permission for its assignment or sale to Rupp.

366.    USB sold Rupp the Shares for $15 dollars, but did not sell him the "related claims or causes of action, associated with the Shares," which claims and causes of action remained with USB the seller to Rupp.

367.    For his 15 dollars, Rupp purportedly got the rights that USB had in the Shares to receive principal and interest on the Shares as well as the right to tender the Shares.

368.    But, despite buying the Shares before their stated 5-year maturity date and that date now having past, Rupp has never exercised the rights he received in Shares including the right to tender and receive contractual payment of the $15 million principal plus interest; the Shares are still outstanding, as USB admits.  It is a reasonable factual conclusion from all the surrounding circumstances, including the admissions of USB corporate representative Strodthoff, that in the dealings among USB, its counsel and Rupp, it was contemplated and agreed that Rupp would not exercise the contractual right under the TDA and Share terms to tender the Shares for redemption or exercise a right to sue USB upon the TDA contract to enforce the redemption.

369.    The purpose of USB's sale of the Shares to Rupp was to prevent SAL from exercising any right to tender the Shares to USB in its role as trustee, if USB prevailed on its claims for rescission.

### FACTS CONCERNING THE CREDIBILITY OF
### MR. GOETZ'S MOST RECENT TESTIMONY

370.    Mr. Goetz's prior deposition testimony given in mid-2005, is more credible than his March 2009 testimony, especially as he admitted that his memory regarding the deal was better at his deposition in June 2005 than it was at trial almost four years later in March 2009.

371. Mr. Goetz was well aware of Olsen's litigation prior to his deposition testimony, yet he did not raise any issues with Mr. Olsen's litigation history during his deposition.

372. Despite his earlier testimony on direct examination by USB which could be viewed as leaning to the contrary, Mr. Goetz in his cross-examination on March 12, 2009, reaffirmed his June 2005 testimony, to the effect that in buying the Shares in May 2002, he was not concerned with ERIC (which he then referred to as "Eel River"), and he was only concerned with the credit support backing.

373. Despite his earlier testimony on direct examination by USB which could be viewed as leaning to the contrary, Mr. Goetz in his cross-examination on March 12, 2009, reaffirmed his June 2005 testimony, to the effect that in buying the Shares in May 2002, he was only concerned with the letter of credit and the standby letter of credit.

374. Despite his earlier testimony on direct examination by USB which could be viewed as leaning to the contrary, Mr. Goetz in his cross-examination on March 12, 2009, reaffirmed his June 2005 testimony, to the effect that in buying the Shares in May 2002, the issue whether the Shares were unconditional obligations of ERIC was not a factor in his evaluation.

375. Despite his earlier testimony on direct examination by USB which could be viewed as leaning to the contrary, Mr. Goetz in his cross-examination on March 12, 2009, reaffirmed his June 2005 testimony, to the effect that in buying the Shares in May 2002, it did not make a difference to Mr. Goetz who the Issuer was and who controlled the Issuer of the stock.

376. The conduct of Mr. Goetz at the time of making the investment make his deposition testimony and his cross-examination testimony more credible than his direct testimony at trial.

## CONCLUSIONS OF LAW

1. Pursuant to the Securities Act of Washington: It is unlawful for any person, in

connection with the offer, sale or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. RCW 21.20.010(2).

2.  The Shares sold to the investors in this case are securities, as defined at RCW 21.20.050(12).

3.  Under the facts of this case. SAL qualifies as a direct seller of securities. SAL was a substantial contributing factor in the sale of the securities and also had ownership of the Shares, however briefly, before transferring them to the investor group.

4.  The Investors received the intended bankruptcy protections that were part of the structure for the Shares. There were no material misrepresentations or omissions concerning those protections

5.  As made clear by the CPOM and the Stoel Rives and Shulkin Hutton bankruptcy opinions, whether or not ERIC had "independent directors" was not a necessary part of the bankruptcy protection for the Shares. In addition, whether ERIC had "independent directors was not material," from a disclosure standpoint, to the issue of whether the flow of funds to pay for the Shares would be protected in the event of the bankruptcy of ERIC.

6.  In any event, USB has not met its burden of proving that Mr. Ross and Mr. Sullivan failed to meet the requirements for "independent directors" that were set forth in ERIC's articles of incorporation.

7.  Because the Investors received the specific bankruptcy protections explicitly set forth in the CPOM as confirmed by the Stoel Rives opinion and because there is no credible evidence that the Investors believed that the Shares had any additional bankruptcy protections,

the Investors could not justifiably rely on any alleged "additional" bankruptcy protections that were not part of the structure of the Shares.

8.     Given the nature of the Shares as VRDN's supported by the Credit Facility, Mr. Ross' dual role as issuer's counsel and as an ERIC director was not material to a reasonable investor in the Shares.

9.     Mr. Ross dual role did not affect the nature of the Shares.  It did not affect the Credit Facility, the bankruptcy opinion, or the Moody's rating.  It likewise did not affect the Investors' ability to put the Shares for redemption at full value plus accrued interest, at any quarter, for any reason.  Further, any failure to disclose Ross's dual role would not have misled a reasonable investor about the nature of the Shares.

10.     Moreover, given the Investors' admissions that they were buying the Credit Facility, were not buying ERIC, and did not care who controlled ERIC, and the non-reliance language in the CPOM, they simply could not have justifiably relied on any allege omission concerning Mr. Ross' dual role.  Any claim of such reliance is simply not credible.   Further any claim of such reliance now is entirely inconsistent with and rebutted by the fact that when USB contacted Mr. Goetz in early 2005 prior to his deposition, Mr. Goetz told USB that the Investors were not concerned that Mr. Ross, who was issuer's counsel, was also an ERIC director because they were looking to the credit protection of the Shares.

11.     Although called a "stock," the Shares had all the features of a VRDN and were treated by the parties, including the Investors, as a debt instrument.  Given the hybrid and principally-debt-like nature of the Shares, the Shares were properly issued under the WBCA.  Accordingly, there were no material misrepresentations or omissions concerning whether the Shares were properly issued under the WBCA.  The failure of ERIC's articles of incorporation to

describe the "preferences, limitations, voting powers and relative rights" of each form of authorized stock does not affect the enforceability of TDA.

12.     As all the parties to the transaction, including the Investors, understood that the Shares although called "stock" would function as a debt offering, there could have been no material misrepresentation or omission about the hybrid nature of the Shares.

13.     There were no material misrepresentations or omissions made in connection with the offering of the subject investment opportunity.

14.     Whether termed a misrepresentation or omission, there was no reliance in fact on the part of the investors as to any alleged "deficiency" in the information provided to the investors in connection with the subject investment.  Furthermore, SAL has overcome any rebuttable presumption of reliance created by law as to any alleged omission.

15.     By its signature on and acceptance of the TDA contract and its duties thereunder, USB is estopped to deny that the Shares were authorized and issued under and pursuant to the TDA, and that the Shares' principal, necessary and essential terms were determined by contract, in the TDA.

16.     USB as a creditor of ERIC, is estopped, just as ERIC itself is estopped, from asserting invalidity of the Shares and the invalidity or unenforceability of the TDA by reason of non-compliance with the WBCA (i.e., estopped from asserting ultra vires). *In re Spokane Concrete Products, Inc*., 126 Wash.2d 269, 892 P.2d 98 (1995). For this reason as well, as a matter of law, there was no material misrepresentation or omission concerning whether the Shares and the TDA provisions were enforceable, as the Ross firm closing opinion stated, by reason of filings made under the WBCA.

17.     The TDA, which contained the material terms of the debt aspects of the Shares,

was fully enforceable under contract law, and there was not a term of the Shares of which the Investors were not aware.

18.     Even if there were some deficiency with the filing of ERIC's Articles of Incorporation under the WBCA, if SAL were not  seller of securities, but merely one who materially aided in the sale of securities, SAL has established a reasonable care defense under RCW 21.20.430(3). SAL did not know that the Articles of Incorporation did not comply with the technical requirements of the WBCA, and as the Placement Agent, SAL could reasonably rely upon opinions of counsel, including bankruptcy counsel, issuers counsel, letter of credit bank counsel and the certificates and filings of such counsel.  Accordingly, SAL reasonably relied upon Mr. Ross' opinion that the WBCA and all other state and federal requirements related to the issuance of the Shares had been complied with.

19.     Under the circumstances here, given the nature of the Shares – a VRDN secured by the Credit Facility and the protections afforded the Investors under the TDA and the credit support documents -- Olsen's history was simply not material to a reasonable investor in the Shares.  Further, any failure to disclose Olsen's history would not have misled a reasonable investor about the nature of the Shares.

20.     The Investors simply could not reasonably rely on any omissions regarding Olsen's history, given both the statements, disclaimers, non-reliance warnings, and risk factors in the CPOM, regarding the Credit Facility and ERIC, and the Investors' testimony that they were not buying ERIC, were not concerned with who controlled Eric, but were instead buying the Credit Facility.

21.     Sterne Agee did not have, nor did it assume, any duty to provide any information about Olsen or his History, beyond the actual language in the CPOM. Accordingly, Mr. Goetz

and the Investors did not justifiably rely upon Sterne Agee with respect to any alleged omission of material fact about Olsen or his history.

22.     While not conclusively binding upon this Court, the provisions of SEC Regulation S-K setting out the "five year rule," 17 C.F.R. §229.401(f), that is widely used by professionals as a disclosure guideline in securities offerings (whether public or privately placed), and which has been respected by many courts as representing the experienced and mature judgment by the SEC (the federal agency charged with implementing federal securities policy and statutes) as to materiality of background information of management, are entitled to considerable weight.  Under all the circumstances, it was not unreasonable for the law firms which delivered the closing opinions upon which Sterne Agee and the Investors respectively relied, and who had been informed of most of the Olsen History, to have concluded, as they did, that Olsen's History was not material and not required to be disclosed in the CPOM or their respective closing opinions.  The Court concludes that the Olsen History was not a material fact requiring disclosure and, as well, that any after-the-fact claim of reliance on the Olsen History is therefore not justifiable in the face of all of the foregoing.

23.     The September 2002 Amendment did not constitute a new sale of securities under the WSSA but merely a change in collateral.  There were no material misrepresentations or omissions in connection with the September 2002 Amendment.

24.     Under all the circumstances, USB by its May 2006 sale of the Shares to Mr. Rupp did not in substance or legally divest itself of the redemption rights (including the pending but uncompleted September 1, 2004 tender) of the Shares, which rights are worth the $15 million contract redemption price under USB's TDA, plus accrued and unpaid interest since September 1, 2004 (together, the "Share Redemption Value"), accordingly if there were to be a finding

against SAL on any of USB's claims:

    a)   SAL would be entitled to a credit against any liability under RCW 21.20.430(1) for such Share Redemption Value, in the event of any judgment in favor of USB and against SAL; or

    b)   USB's alleged damages from any violation of RCW 21.20.430(1) would be reduced by such Share Redemption Value.

25.    Alternatively, USB's May 2006 sale of the Shares to Mr. Rupp was intentional and inequitable conduct undertaken to deprive SAL of its rights should USB prevail on its claims.  By purporting to transfer of the Share Redemption Value for a mere $15.00 to Mr. Rupp, USB engaged in a fraudulent conveyance and therefore if there were to be a finding against SAL on any of USB's claims, USB would be estopped from denying, and  would be ordered to give SAL credit for, the Share Redemption Value against any judgment being entered against SAL in this action.

26.    USB is improperly seeking to indemnify itself in this case.  WSSA does not provide for its use as a means of indemnification, particularly in RCW 21.20.430(1) and (3), and it cannot be so used here, as USB has attempted.  USB is barred from obtaining indemnification under, and by the terms of, any other Washington statute, including RCW 4.22.040(1) and 4.22.040(3).  USB has not established a "relationship" basis, necessary for an implied common law right of indemnification from Sterne Agee, which had no agreements with USB and which never agreed, implicitly or explicitly, to provide warranties or indemnity to USB.  USB breached its fiduciary obligation under the trust instrument (the TDA), and as such committed a tort, and

under Washington public policy and law, an active tortfeasor is not entitled to indemnity from another alleged tortfeasor.

DATED this 5th day of May, 2009.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE